THE PEOPLE *ex rel*. JESSE WHITE, Secretary of State, Plaintiff-Appellant, v. RANDALL S. TRAVNICK, d/b/a Equine Data Management Software, *et al.*, Defendants-Appellees.

Second District    No. 2—03—1080

Opinion filed March 17, 2004.

1054

Lisa Madigan, Attorney General (Gary S. Feinerman, Solicitor General, and Deborah L. Ahlstrand, Assistant Attorney General, of counsel), and Tanya Solov, of Department of Securities, all of Chicago, for appellant.

Jonathan M. Cyrluk and Todd J. Haugh, both of Stetler & Duffy, Ltd., of Chicago, and Norman D. Vinton, of Weisz, Michling, Hofmann, P.C., of Woodstock, for appellees.

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

The State sued defendants for violations of the Illinois Securities Law of 1953 (Securities Law) (815 ILCS 5/1 *et seq.* (West 2002)) and sought a preliminary injunction freezing defendants' assets, including the proceeds of life insurance policies held in the name of the late Randall Travnick (Randall) with his wife Janice Travnick (Janice) as beneficiary. The trial court granted the injunction with respect to all assets except Janice's, finding that the State failed to establish a *prima facie* case that Janice committed securities fraud. Plaintiff appeals, and we affirm.[1]

The State alleged the following in its complaint for injunctive relief. Randall and Janice owned and operated Equine Data Management Systems (EDMS), a company that produced a popular computer program for veterinarians and horse breeders. EDMS also offered an investment program. EDMS stated in its literature that contributions to the investment program would be applied to the purchase of computer hardware that EDMS would lease to its software customers. EDMS promised rates of return as high as 26.82% each year. EDMS began accepting investments as early as 1988, but by February 2003

---

[1]On the day of the preliminary injunction hearing, the State moved to amend its complaint to add a claim for forfeiture of defendants' assets under a newly enacted amendment to section 11 of the Securities Law. See Pub. Act 93—580, eff. August 21, 2003 (amending 815 ILCS 5/11 (West 2002)). The trial court granted the motion. No issue regarding this new count is before us on this interlocutory appeal.

several interest and principal checks to investors were returned for insufficient funds. The State alleged that Randall and Janice continued to solicit investors and accept investment funds despite knowing that EDMS's bank account was overdrawn. In May 2003, Randall committed suicide. The State alleged that defendants' conduct violated the Securities Law. The State sought an order enjoining Janice and the other defendants from continuing to violate the Securities Law. The State also sought the appointment of a receiver or conservator for defendants' assets. The State filed simultaneously with the complaint a motion for a temporary restraining order freezing defendants' assets, including the proceeds of several life insurance policies held in Randall's name with Janice as beneficiary. The State asserted that the Travnicks used investor funds to pay the premiums for the life insurance policies. The trial court entered a temporary restraining order freezing defendants' assets. Subsequently, Janice moved to dissolve the temporary restraining order as it applied to the insurance proceeds. Janice argued that the evidence did not show that she engaged in securities fraud. She also argued that Randall's liability was not a basis for process against the insurance proceeds. To support this claim, Janice cited section 238(a) of the Illinois Insurance Code (Insurance Code) (215 ILCS 5/238(a) (West 2002)), which exempts the proceeds of life insurance from process for the liabilities of the insured except in an amount equal to premiums that the insured paid in fraud of creditors. The court denied the motion to dissolve and set the preliminary injunction motion for a hearing.

The factual issue that concerns us on this appeal is whether the State produced sufficient evidence at the hearing to prove that Janice participated in a scheme to defraud investors in violation of the Securities Law. Among the witnesses whom the State called to prove Janice's alleged illegal activity were brothers George and Robert Evanson, both of whom had invested in the EDMS program. George testified that he first inquired of Randall regarding the EDMS program in the spring of 2001. Randall explained to George that the funds invested in the program would be used to purchase computer hardware that EDMS would lease to its software customers.

George testified that he subsequently spoke with Randall about the investment program on several occasions over the phone. Based on Randall's representations, George began to invest in the program. Later, at his request, George met with Randall and Janice at the offices of EDMS in Woodstock. Asked what was discussed at the meeting, George testified:

> "What was discussed was the investment program that I was investing in and what I had invested in and that I wanted to invest more.

I wanted to just talk to them and see again what their business was because the first part was only done over the telephone with the $5,000 investment and then I invested it looks like in July the $35,000 *** but I didn't want to do that until I saw there was a going business."

George recalled that at one point in the conversation, Randall and Janice both pointed to a large wall map of the United States and remarked that EDMS had 600 clients throughout the nation who leased EDMS computer equipment.

George testified that later, in May 2002, he and his brother Robert met with Randall and Janice in Woodstock to discuss the investment program. At one point in the conversation, George and Robert remarked that they were considering taking out a life insurance policy on Randall to protect their investment. Randall replied that he already had life insurance worth $3 million and that Janice would take over the business if he died. Janice acknowledged to George and Robert that the life insurance policies indeed existed. Asked about what else Janice said during the May 2002 meeting, George testified, "I could not say exactly what she said. We would ask a question on interest to Randy. She would acknowledge the interest. Randy would acknowledge the interest." Later, on cross-examination, George admitted telling Janice's counsel in an interview before the hearing that he did not remember anything that Janice said during the May 2002 conversation. George explained the discrepancy by stating he had been "very evasive" in speaking to Janice's counsel.

George testified that he had no substantive conversations with Janice regarding the investment program before his first meeting at the offices of EDMS. George testified that all of the correspondence he received regarding the investment program was signed by Randall. He further testified that after the checks from EDMS began to be returned for insufficient funds, he spoke with Randall, not Janice, about the checks.

Robert contradicted his brother's account of the May 2002 meeting with Randall and Janice. Robert denied that Janice was an active participant in the meeting. He testified that "she didn't say a word during the meeting" but "basically just sat there and listened." Robert agreed with George's testimony that they asked Randall at the meeting what would happen to the business after he died and that Randall answered that he had $3 million in life insurance and that Janice would take over the business when he died.

Plaintiff also called Carol Wood, who testified that she purchased the EDMS software in the late 1980s for use in her horse breeding business. She began selling software for EDMS in 1995 and continued

for about four or five years. She negotiated her sales commission with Randall, not Janice. Wood testified that she phoned the EDMS office several times seeking technical assistance with the software, but she "usually" called to speak with Randall and does not remember ever speaking with Janice about a technical issue with the software. Wood worked in the EDMS booth at the annual equine convention from 1995 through 2000. She testified that she never saw Janice demonstrate the EDMS software or discuss the EDMS investment program with interested parties at these conventions. Janice's role at the conventions was "meeter and greeter." Wood testified that Janice knew less about the software than did Wood or any of the 3,000 EDMS customers who used the EDMS software. However, Wood later admitted that she did not know how much Janice actually knew about the EDMS software but "assumed" that she knew more than Janice.

Wood testified that she had invested in the EDMS program. She testified that she had no discussions with Janice regarding the investment program until after Randall's death. At that time Wood asked Janice about the security of the investors' funds. Wood testified that Janice became "very defensive" during the conversation.

Donna Woellert testified that from 1995 to 2001 she worked for EDMS out of the Woodstock office, providing technical support for users of the EDMS software. She was trained exclusively by Randall. Woellert testified that when she began working at EDMS, Janice was working another job outside EDMS and Woellert rarely saw her. Woellert testified that Janice subsequently moved to California for two years and returned to Woodstock in 2000, at which point Randall announced that Janice would assume a managerial role at EDMS. Woellert testified that Janice subsequently worked in the office for about one hour each day. Janice's work consisted principally of checking e-mail from EDMS customers, answering phone calls, and collaborating on the EDMS software newsletter with EDMS employee Betty Flagler. Janice often consulted Woellert regarding how to answer some of the e-mails. Woellert testified that she did not consider Janice's tasks as amounting to management activities. Woellert admitted, however, that she was not in the EDMS office at all hours and could not have observed what Janice might have been doing during those times. Woellert testified that she and Janice worked in the EDMS booth at equine conventions. Woellert described Janice's role at these conventions as that of a "candy girl" who distributed candy to induce conference attendees to learn about the EDMS software from Woellert and other EDMS employees. Woellert testified that Janice did not demonstrate the software because she was "management" and "didn't need to know how to hands on [sic] anything."

Woellert testified that she had "very minimal" knowledge of the EDMS investment program. Woellert never saw Janice speak with anyone regarding the investment program and does not know how much Janice knew about the program. Woellert testified that, in addition to the software newsletter, EDMS also published a newsletter about the investment program. Woellert testified that Randall alone worked on the investment newsletter. Woellert also testified that, unlike many of the other office software programs, the software program containing information about the EDMS investment program was not on the network shared by the office computers.

Melissa Broman, a certified public accountant, testified that she prepared tax returns for the Travnicks from 1994 to 2000. The Travnicks filed jointly in these years and their income included business income from EDMS. Broman testified that when she needed information while preparing the tax returns she spoke with Randall, not Janice, the "vast majority" of the time. Broman testified that she had only two substantive conversations with Janice regarding the preparation of the Travnicks' returns. The first conversation concerned a tax return for either Janice's or Randall's parents and the second concerned the sale of a home in California. Later, Broman admitted that the latter meeting may have been with Janice's sister rather than Janice.

Kenneth Podeschi, an attorney for the Illinois Securities Department, testified that he reviewed bank records for the Travnicks' personal and business accounts. Podeschi testified that in 2000, 2001, and 2002, investor money was commingled with money from other sources in the Travnicks' accounts. The commingled funds were used to pay premiums for two of the six life insurance policies held in Randall's name. Podeschi testified that he found six checks written from commingled funds that were signed by both Janice and Randall and designated for construction and landscaping work. Podeschi testified that he could find no indication that any expenditures for computer hardware were made from the business accounts.

Lastly, the State called Janice as an adverse witness. Janice acknowledged the existence of six life insurance policies held in Randall's name with her as sole beneficiary. Janice admitted that the checks Podeschi identified as having been signed by her were for construction and landscaping work on the Travnick home, including the addition of a home office as well as a bedroom. Janice testified that Randall filled out almost all of the checks written from their accounts. She explained that if her signature was required on a check due to the nature of the account, Randall would have her sign the check before he filled it out.

At the close of the State's case, Janice moved for a directed finding that she had no involvement with the alleged securities fraud and therefore the State had no grounds to freeze the insurance proceeds. The trial court found that Randall and EDMS committed securities fraud with respect to the EDMS investment program but that there was insufficient evidence of Janice's involvement. Relying on section 238(a) of the Insurance Code as well as common-law principles, the trial court held that the proceeds of Randall's life insurance policies were exempt from process but for an amount equal to the premiums paid in fraud of Randall's creditors. The State filed an interlocutory appeal.

■ Section 13(F) of the Securities Law (815 ILCS 5/13(F) (West 2002)) permits the State to seek a permanent or preliminary injunction to enjoin violations of the Securities Law. A preliminary injunction is a provisional remedy granted to preserve the status quo pending a hearing on the merits of a case. *Hanchett Paper Co. v. Melchiorre*, 341 Ill. App. 3d 345, 351 (2003). A court may not grant a preliminary injunction without a showing that: (1) the party seeking the preliminary injunction possesses a clear right or interest needing protection; (2) the party has no adequate remedy at law; (3) irreparable harm will result if the preliminary injunction is not granted; and (4) there is reasonable likelihood of success on the merits. *Hanchett Paper*, 341 Ill. App. 3d at 351. The party seeking a preliminary injunction does not carry the same burden of proof that is required to prevail on the ultimate issue. *A.J. Dralle v. Air Technologies, Inc.*, 255 Ill. App. 3d 982, 989 (1994). Rather, the reviewing court is to decide whether the plaintiff has demonstrated a *prima facie* case that there is a fair question as to the existence of the rights claimed, that the circumstances lead to a reasonable belief that the plaintiff probably will be entitled to the relief sought, and that the matters should be kept in the status quo until the case can be decided on the merits. *A.J. Dralle*, 255 Ill. App. 3d at 989. Generally, the standard of review regarding the propriety of a preliminary injunction is whether the trial court abused its discretion in determining that the plaintiff provided *prima facie* evidence to support his or her claim. *People v. Studio 20, Inc.*, 314 Ill. App. 3d 1000, 1004 (2000). An abuse of discretion occurs when no reasonable person would take the trial court's view. *Nickels v. Burnett*, 343 Ill. App. 3d 654, 662 (2003). However, to the extent that the trial court's ruling was based on its construction of a statute, a reviewing court may resolve the issue as a matter of law using a *de novo* standard of review. *Studio 20, Inc.*, 314 Ill. App. 3d at 1004-05.

The parties do not appear to contest the trial court's finding that Randall and EDMS committed securities fraud with respect to the

EDMS investment program. Rather, they disagree over whether there is sufficient evidence that Janice was involved in the fraud. The State argues, however, that the insurance proceeds are subject to process regardless of whether Janice was involved in the fraud. We disagree.

■ Section 238(a) of the Insurance Code provides in relevant part:
"All proceeds payable because of the death of the insured *** shall be exempt from execution, attachment, garnishment or other process, for the debts or liabilities of the insured incurred subsequent to the effective date of this Code, except as to premiums paid in fraud of creditors within the period limited by law for recovery thereof." 215 ILCS 5/238(a) (West 2002).

This section, which bars process against insurance proceeds based on the liability of the insured except as to premiums paid in fraud of creditors, codifies the holdings of a long line of cases. See *Vieth v. Chicago Title & Trust Co.*, 307 Ill. App. 99 (1940); *Ramsey v. Nichols*, 73 Ill. App. 643 (1898); *Hubbard v. Stapp*, 32 Ill. App. 541 (1889). We agree with the trial court that this section protects the insurance proceeds from process that is based only on the conduct of the insured, that is, Randall. However, because this section does not exempt insurance proceeds from process that is based on the liability of the beneficiary (*Roth v. Kaptowsky*, 393 Ill. 484, 490 (1946)), we will review the trial court's finding as to Janice's liability. First, however, we address the State's arguments against the application of section 238(a) of the Insurance Code.

■ The State argues that section 238(a) of the Insurance Code is inapplicable because the section applies only to *in personam* actions and the present action sounds *in rem* because the State has requested the appointment of a receiver in count I of its complaint. The State is correct that a receivership is an *in rem* proceeding (*In re Possession & Control of the Commissioner of Banks & Real Estate of Independent Trust Corp.*, 327 Ill. App. 3d 441, 465 (2001)), but here no receiver has yet been appointed. Therefore, there is no receivership. We recognize that count II seeks *in rem* forfeiture of defendants' assets. However, no issue regarding that count is before us on this appeal.

■ The State also cites authority holding that personal property exemptions for debtors under section 12—1001 of the Code of Civil Procedure (735 ILCS 5/12—1001 (West 2002)) do not apply to forfeiture actions based on violations of criminal laws because section 12—1001 protects innocent debtors, not those who obtain their personal property through criminal conduct. See *People v. $8,450 United States Currency*, 276 Ill. App. 3d 952, 955-56 (1995). The State argues that section 238(a) of the Insurance Code also should not be applied to protect those who obtain property through criminal conduct.

We agree. Section 238(a) as written is perfectly consistent with the principles underlying. *$8,450 United States Currency*. Section 238(a) protects insurance proceeds from process based on the liability of the insured but not from process based on the liability of the beneficiary. The section does not insulate the beneficiary who obtains an insurance policy through a securities violation. Thus, section 238(a) of the Insurance Code provides no more protection for the guilty beneficiary than does section 12—1001 of the Code of Civil Procedure.

■ The State also argues that the scope of the relief it may obtain for a securities violation is determined not by section 238(a) of the Insurance Code but by section 11(I)(2) of the Securities Law (815 ILCS 5/11(I)(2) (West 2002)), which broadly permits the trial court "to enter an order for the appointment of the court or a person as a receiver, conservator, ancillary receiver or ancillary conservator for the defendant or the defendant's assets located in this State, or to require restitution, damages or disgorgement of profits." The State argues that the absence in section 11(I)(2) of the Securities Law of any restriction on the type of assets that may be subject to process for an award of damages indicates that the legislature did not intend for the exemptions in section 238(a) of the Insurance Code to limit the damages available under the Securities Law. Of course, a premise of the State's argument is that both sections address what particular assets may be attached to satisfy an award of damages based on an insured's liability. The State reasons therefrom that the absence in the Securities Law of any restriction on available assets suggests a superseding of the Insurance Code. Where there is an alleged conflict between two statutes, the court must, where reasonably possible, interpret those statutes in a manner that avoids an inconsistency and gives effect to both statutes. *Hager v. II In One Contractors, Inc.*, 342 Ill. App. 3d 1082, 1088 (2003). We do not see the conflict the State sees. Section 238(a) of the Insurance Code expressly addresses what types of assets may be attached to satisfy a damages award based on an insured's liability. Although section 11(I)(2) of the Securities Law specifies the remedies available for violations, which include damages, the section does not address what types of assets may be attached to satisfy an award of damages. Therefore, because the sections address different subjects, we see no conflict between section 11(I)(2) of the Securities Law and section 238(a) of the Insurance Code. We conclude that the exemption for insurance proceeds in section 238(a) of the Insurance Code limits the damages available under section 11(I)(2) of the Securities Law.

Next, the State argues that even if section 238(a) of the Insurance Code applies to protect the insurance proceeds from process based on

Randall's conduct, the proceeds are not exempt under section 12—1001 of the Code of Civil Procedure. Section 12—1001 generally protects certain property of a debtor, including life insurance proceeds, but provides exclusions based on the conduct of the debtor. 735 ILCS 5/12—1001 (West 2002). The State argues that Janice's conduct satisfies these exclusions. However, section 12—1001 is for the protection of a judgment debtor. *State Bank of Antioch v. Nelson*, 132 Ill. App. 3d 120, 122-23 (1985). Before we can apply section 12—1001 to the insurance proceeds, we must be satisfied that the State has shown a likelihood of succeeding on the merits of its securities action and obtaining a judgment against Janice. As we will explain, we do not believe that the State has shown such a likelihood.

■ We now examine whether there is sufficient evidence that Janice was involved in a violation of the Securities Law so as to remove the insurance proceeds from the protection of section 238(a) of the Insurance Code. The State alleged that the Travnicks' conduct violated the following proscriptions:

"Violation. It shall be a violation of the provisions of this Act for any person:

\* \* \*

F. To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.

G. To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

\*\*\*

I. To employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly." 815 ILCS 5/12 (West 2002).

■ We agree with Janice that the State failed to establish that she was involved in the sale of any security to EDMS investors. The State relies primarily on the Evanson brothers' testimony that Janice and Randall discussed the investment program initially with George and, later, with both George and Robert. However, the only specific instance of Janice's participation that George could recall from the first conversation was her pointing to a map of the United States and remarking about the number of lessees of EDMS computer equipment across the nation. George and Robert gave conflicting accounts of the second conversation. George testified that Janice fully participated in the meeting while Robert testified that Janice said nothing at all dur-

ing the meeting. The State's remaining evidence served only to suggest that Randall alone advertised and operated the investment program even though Janice may have had some role in the management of EDMS. George and Robert were the only witnesses who claimed to have discussed any aspect of the investment program with Janice before Randall's death and the corresponding end of the program. All other discussions were with Randall alone. Moreover, Randall alone signed all of the checks and correspondence to investors that the State adduced. Woellert testified that Randall alone worked on the investment newsletter. We hold that the State failed to establish a *prima facie* case that Janice was involved in a scheme to defraud investors. We conclude, therefore, that the State did not satisfy the requisites for a preliminary injunction freezing the insurance proceeds held by Janice.

■ The State further argues that, regardless of whether Janice was involved in the fraud, the insurance proceeds should be placed in a constructive trust because equity so demands. However, a constructive trust is an equitable remedy (*Eychaner v. Gross*, 202 Ill. 2d 228, 274 (2002)), and a court may not exercise its equitable powers where there is clear statutory authority to the contrary (*First Federal Savings & Loan Ass'n v. Walker*, 91 Ill. 2d 218, 227 (1982)). Here, section 238(a) of the Insurance Code controls, barring any process against the insurance proceeds beyond the value of premiums paid in fraud of creditors.

For the reasons stated above, the judgment of the circuit court of McHenry County is affirmed.

Affirmed.

BOWMAN and CALLUM, JJ., concur.