Nos. 3-05-0550, 3-05-0906 (consol.)
_____

Filed May 1, 2007.

IN THE APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2007

| | | |
|---|---|---|
| MICHAEL H. JONES, | ) | |
| | ) | |
|     Plaintiff-Appellee, | ) | Appeal from the Circuit Court |
| | ) | for the 14th Judicial Circuit, |
| v. | ) | Whiteside County, Illinois |
| | ) | |
| THE DEPARTMENT OF PUBLIC | ) | |
| AID n/k/a The IL Department of | ) | |
| Healthcare and Family | ) | No. 2005-MR-37 |
| Services; BARRY S. MARAM, | ) | |
| Director, or His Successor, in His Official | ) | |
| Capacity; THE IL DEPARTMENT OF | ) | Honorable Vicki R. Wright |
| HUMAN SERVICES; and CAROL L. | ) | Judge, Presiding |
| ADAMS, Secretary, or Her Successor, | ) | |
| in Her Official Capacity, | ) | |
| | ) | |
|     Defendants-Appellants. | ) | |

_____

JUSTICE O'BRIEN delivered the opinion of the court:
_____

In 1991, plaintiff Michael Jones suffered a severe spinal cord injury when he was seven years old. Until the time he was 21 years old, Michael received in-home around-the-clock nursing care funded through a Medicaid waiver program administered by the defendant Illinois Department of Healthcare and Family Services (the Department) (formerly known as the Illinois Department of Public Aid). Michael's eligibility under the Medically Fragile/Technology Dependent (MF/TD) home service program lapsed when he turned 21 years of age. 89 Ill. Adm. Code §120.530, added at 28 Ill. Reg 13760 (eff. October 1, 2004) (the Code). Thereafter, the Department provided for Michael's care through a different Medicaid waiver program that, as applied to Michael, considerably reduced the

funds available to him for in-home care; nevertheless, the nurse providers administering to Michael continued to serve him on a 24-hour basis as they had under the MF/TD program. Michael filed a motion for injunctive relief pending administrative review of the change in his service plan. On July 21, 2005, the trial court granted Michael's motion, ordering the Department to continue paying for Michael's care at the rate he had previously received under the MF/TD program. The trial court also ordered the Department to pay the nursing agency providing Michael's services for an arrearage representing the difference between the amount that had previously regularly been paid and the amount the Department had paid under the new program, beginning in December of 2004. On November 15, 2005, the trial court granted Michael an extension of the preliminary injunction. The Department has filed an interlocutory appeal of both orders. We affirm the trial court orders in part and vacate in part.

FACTS

The pleadings and evidence in the record reveal the following facts. In 1991, when he was seven years old, plaintiff Michael Jones was severely injured in a bicycle/motor vehicle accident. As a result of the accident, Michael incurred the highest-level spinal cord injury and became severely disabled. Michael is permanently paralyzed from the neck down and is completely ventilator dependent. He has multifaceted critical care medical needs and requires constant monitoring and skilled nursing services in order to survive. Michael is mentally alert. He graduated from high school with a 4.0 grade point average and receives excellent grades at a community college near his home. He intends to complete college and enter into a career. Michael receives disability benefits under the Supplemental Security Income program and he is eligible for Medicaid.

Until he turned 21 years of age on November 28, 2004, Michael was eligible for, and had been receiving, funding for in-home nursing care through a special Medicaid waiver program administered by the Department. The program allows for the funding of in-home care of MF/TD children so long

2

as the costs of the care do not exceed the average cost that would be incurred if a child were hospitalized for the same care. 89 Ill. Adm. Code §120.530, added at 28 Ill. Reg. 13760 (eff. October 1, 2004). The Department estimated that if Michael was hospitalized, his care would cost approximately $49,400 per month. If Michael were to be hospitalized for his care, the cost would be covered through Medicaid.

Under the MF/TD program, Michael was authorized to receive 136 hours of home nursing care a week at a cost of $17,000 per month or $534 per day. This approach effectively represents around-the-clock, 24-hour care, primarily from professional nurses. Michael's parents have provided an additional 32 hours a week of his care. For 13 years, Michael's caretaker nurses have been provided by Trinity Regional Health Systems (Trinity). When Michael turned 21 years of age on November 28, 2004, he became ineligible for the MF/TD program. Nothing about Michael's needs or condition changed between the time he began receiving treatment under the MF/TD program and the occurrence of his twenty-first birthday.

When Michael "aged out" of the MF/TD program in November of 2004, his case was transferred from the Division of Specialized Care for Children (DSCC) to the Department of Human Services (DHS), Division of Rehabilitation Services (DRS). Michael had met with a DHS/DRS caseworker in July of 2004. The caseworker documented the meeting as a "preliminary informational meeting." The caseworker categorized Michael as a "very high maintenance case" and noted that if Michael was placed in a hospital intensive care setting, the cost of his care would approximate $40,000 per month. The caseworker also noted that at the level of funding available for Michael's adult care, the caseworker would not be able to develop a safe service plan for Michael. In December of 2004, under the Medicaid waiver program administered by the DRS and pursuant to an "exceptional care" section of the Code, the DRS implemented an interim plan that provided Michael $9,720 per month

3

for in-home nursing services. 89 Ill. Adm. Code §140.569, expedited correction at 31 Ill. Reg. 1745 (eff. August 18, 2006). Under section 140.569 of the Code, the allowable rate for exceptional care is determined by examining the average cost for the same services in a "nursing facility." 89 Ill. Adm. Code §140.569, expedited correction at 31 Ill. Reg. 1745 (eff. August 18, 2006). For Michael, the funds provided under the exceptional care program translate to approximately 76 hours a week of in-home care. It is undisputed that Michael cannot survive at home with only this reduced level of medical attention.

Michael filed an administrative grievance challenging the reduction in funding for his in-home care. The Department held an administrative hearing on March 31, 2005. In her findings of fact, the hearing officer noted as undisputed that Michael is ventilator dependent with total dependency in all activities of daily living. The hearing officer noted Michael had provided correspondence that included a letter from his physician dated October 15, 2004, confirming his level of nursing care need at 136 hours per week. This letter, included in the record, is from Dr. Al Torres, director of the Pediatric Home Ventilation Program at the University of Illinois College of Medicine in Peoria and a physician of Michael's. By way of the letter, Torres indicated his opinion that if Michael does not receive 136 hours of home nursing care per week he will require admission to the hospital. Dr. Torres reiterated his opinion in correspondence dated June of 2005. The hearing officer also noted Michael had provided a 12-page correspondence from his registered nurse detailing his medical needs and care requirements and that Michael's mother had contacted facilities servicing ventilator-dependent patients and received estimates of $400 to $800 a day for the cost of care Michael must receive.

As noted in the hearing officer's findings of fact, the DHS/DRS indicated its ability to address Michael's needs was limited by section 679. 50(d) of the Code, which sets the service cost maximum (SCM) based on an individual's determination of need (DON) scores. 89 Ill. Adm. Code §679.50(d),

4

amended at 31 Ill. Reg. 422 (eff. December 29, 2006). The hearing officer noted Michael had received a DON of 73. The DHS/DRS indicated that even if Michael scored in the 80 to 100 range, his SCM would be only $2,495 per month. Section 679.50 of the Code states, in part, that the SCM is "the maximum amount that may be expended for services through [the home services program (HSP)] for an individual who chooses HSP services over institutionalization." 89 Ill. Adm. Code §679.50(a), amended at 31 Ill. Reg. 422 (eff. December 29, 2006). The DHS/DRS also indicated to the hearing officer that it had submitted Michael's case to the Department to obtain his Exceptional Care Rate (ECR) as a ventilator-assisted individual. 89 Ill. Adm. Code §682.520(c), amended at 24 Ill. Reg. 7724 (eff. May 12, 2000). The Department determined Michael eligible for a maximum of $9,289 per month. Following the hearing, Barry Maram, Director of the Department, determined the DHS/DRS decision could not be upheld and directed the DHS/DRS to make a new decision based in part on evidence of comparable "institutionalized costs," evidence of which, Maram stated, the DHS/DRS had not provided.

Following the administrative ruling, the DHS/DRS took no action. Michael filed a complaint for *mandamus* and injunctive relief, asking, in part, the court compel the DHS to formulate a new service plan for him. Michael also filed a motion for a preliminary injunction asking the trial court to compel the Department to pay a balance due to Trinity of $48,398, a balance for which Trinity was demanding payment and which represented the difference, approximately $8,000 per month, between the cost for services the DHS was affording Michael and the costs he was incurring for the continuation of his full-time at-home acute care. On July 7, 2005, the trial court entered a *mandamus* order directing the DHS to formulate a new plan and to provide the Department with evidence of comparable institutional costs. The trial court also directed no changes were to be made to Michael's at-home service plan pending a hearing on his motion for preliminary injunctive relief.

A hearing on Michael's motion for a preliminary injunction took place on July 21, 2005. Michael presented three witnesses, who, in part, offered testimony about Michael's daily needs. Because the level of acute care Michael needs to survive is not in dispute, the following is a general overview of the detailed testimony given at the hearing. Donna Van Zuiden, a nurse with 35 years of experience, testified she has served as an in-home nurse for Michael since he was ll years old. Van Zuiden indicated that every system of Michael's body is compromised and he is totally dependent for all of his physical needs. Care of Michael requires intensive and continuous monitoring of his equipment and his physiological systems. Michael requires 22 medications a day. During their shifts, the nurses are continually engaged in Michael's care. They do not perform any household chores. Van Zuiden testified with detail about the necessity of immediate intervention to prevent a catastrophic breakdown of Michael's physiological systems or his equipment. Van Zuiden stated that the in-home nurses had on many occasions precluded the necessity of a trip to the hospital for Michael. On one occasion, when Michael was admitted to the hospital for a non-emergency procedure, his daily care requirements were charged by the hospital at a rate of $120 per hour. His hospital stay for three days cost $13,500.

Van Zuiden stated that if Michael were placed in a hospital setting he would need to be in the intensive care unit. Van Zuiden testified that if in a nursing home, Michael would require his own ventilator-trained nurse constantly attending to him. In anticipation of Michael's impending adulthood, in an attempt to find appropriate home care for him, Van Zuiden and Michael's family contacted family members, nurses' assistants, registered nurses and lay persons. They were unsuccessful in locating anyone who "would take [the] risk" of caring for Michael at home.

Van Zuiden indicated Michael's nurses also provide emotional and psychological support for Michael. They groom and dress him daily. When Michael leaves the home, nurses accompany him and

6

carry emergency equipment with them. Michael's outings require him to use a different ventilator than the one he uses at home; the nurses are skilled in monitoring the different parameters of the additional ventilator. The nurses accompany Michael to school and facilitate verbal exchanges with his professors and teacher's aid by lip-reading Michael's communications.

Van Zuiden also testified that Michael's home environment allows him to maintain close contact with his family and friends on a daily basis. Michael's grandparents live close to him. Michael's grandfather visits with Michael four times a day and his grandmother weekly recites church services to Michael and delivers communion to him. Michael's family members take him to concerts, racetracks and community events. Van Zuiden expressed concern that if Michael were placed in a hospital his family members would not be able to keep up the frequency of visits. Van Zuiden also testified that placing Michael in a hospital was placing him in "a sick place," where he would be at more risk of contracting infections and other diseases. For these reasons, and because Michael would experience a loss of hope and companionship in a hospital setting, Van Zuiden opined that moving Michael out of his home setting could result in his death.

Rebecca Mueller, another of Michael's home nurses, also testified. Mueller has 34 years of nursing experience. She has worked with Michael since the year 2000. In Mueller's opinion, if Michael is not provided home nursing services, his only alternative is placement under the high level of observation he would receive in the intensive care unit of a hospital. Mueller expressed concern for Michael's survival even in a hospital setting. Mueller also testified that some of her former patients who had transferred to institutions from home died soon thereafter. In some cases, patients of Michael's age asked to be removed from their ventilators.

Michael's mother, Winifred Jones, also testified. Jones testified Michael is the youngest of four children, all of whom regularly visit Michael and take him on family outings. Jones stated she and her

husband, both employed, care for Michael themselves 32 hours a week. At least one of them is also home while Michael receives services from the in-home nurse. Michael's parents receive 336 hours of respite a year. Jones's insurance pays $3,000 a month for Michael's medication; this coverage would be unavailable if Michael were in the hospital.

Jones testified she had contacted three hospitals to obtain quotes for Michael's care. The general quotes she received ranged from $1,500 to $1,800 a day. At the time of her testimony, Jones stated there was an outstanding balance of $48,500 owed to Trinity, which had continued to provide Michael with full care despite the reduced payment of $9,270 per month it was receiving from the Department. Trinity issued Jones a demand for payment. She was not certain whether Trinity would continue to provide Michael around-the-clock care if the debt was not paid.

Following the preliminary injunction hearing, the trial court found Michael had met the criteria for preliminary injunctive relief. The trial court ordered the Department to maintain the benefits Michael was receiving prior to his twenty-first birthday and refrain from reducing his benefits until he had exhausted his right to administrative relief. The trial court also ordered the Department to pay Trinity $48,398. The Department filed a motion for stay of judgment which the trial court denied. The Department filed an interlocutory appeal of the trial court's order of preliminary injunction which is now before this court for review.

The Department held a second hearing on September 7 and 8, 2005. Michael's presentation to the hearing officer essentially indicated that which has been discussed above, and included the two letters from Dr. Torres. The DHS/DRS presented witnesses at the hearing familiar with the Home Service Program (HSP). These witness indicated, in part, the following. The case manager for Michael indicated that when the DHS/DRS counselor determined that a safe service plan could not be established for Michael within the SCM, an effort was made to maximize the number of service hours

8

available by requesting an Exceptional Care Rate (ECR). The counselor was aware the family had attempted to find other resources to supplement the HSP.

Other DHS/DRS witnesses indicated the Exceptional Care Rate program is a rate program with different categories of illness or care and is not based upon an individual patient. When an individual requires multiple types of care, the care that would be the most expensive is the category used to determine the ECR. The ventilator-dependent rate is the highest available rate. The ECR is tied to the reimbursement rate nursing homes, in the appropriate geographical region, would receive from the Department. The Department sets the ECR for the nursing home facilities and these are the rates that are used to pay a nursing facility. The DHS/DRS has no authority to exceed an ECR.

In October of 2005, the Department's director, Maram, issued the following final administrative decision. Maram concluded that under section 684.70 of the Code (89 Ill. Adm. Code §684.70(c), amended at 34 Ill. Reg. 433 (eff. December 29, 2006), the SCM may be exceeded for ventilator-assisted individuals receiving HSP services. In such cases, however, the amount expended shall not exceed the ECR established by the Department. Maram also concluded the ECR is based upon the rate the Department pays to a nursing facility and that DHS/DRS has no control over these rates. Maram indicated the DHS/DRS had provided a list of "comparable institution[s]," nursing homes capable of providing services to ventilator-assisted patients. In conclusion, Maram indicated Michael had supported his argument that should he not be afforded 136 hours a week of home nursing services, he would require a hospital level of care. In upholding the DHS/DRS service plan, Maram stated a hospital level of care is not within the parameters of the HSP.

Following Maram's final decision, Michael filed a third amended complaint for declaratory relief under the Americans with Disabilities Act of 1990 (42 U.S.C. §12132 (2000)) (ADA), review of the Department's final decision and permanent injunctive relief. Michael also filed a motion to extend

9

the preliminary injunction pending the trial court's review of the administrative decision. At the hearing on the motion to extend the preliminary injunction, the Department provided three statements made pursuant to section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2004)) as part of its motion to oppose Michael's motion. Chris Welch, a licensed nursing home administrator for eight years and the administrator of River Park Health Care Center (River Park) for five years, stated his facility provides care to two patients using ventilators at a Medicaid reimbursement rate of $327.89 per day. Based on his review of the affidavit of Van Zuiden, one of Michael's nurses, and the reports of Torres, Michael's physician, Welch concluded there is no medical reason Michael could not be safely served at River Park for the ECR of $327.89 per day. Cindy Waller, a nurse with 15 years experience, including experience with pediatric at-home care for children with tracheotomies and respiratory conditions, and who is employed as the director of nursing at River Park, made a statement that mirrored Welch's.

Additionally, the Department presented the affidavit of Barbara Ginder, chief of the Bureau of Inter-Agency Coordination for the Department. Ginder testified to the following information. As of October 31, 2005, the DRS provided services to 102 persons dependent on ventilators through the HSP. If all 102 persons were served at an estimated cost of $17,000 per month, the estimated annual cost would be $204,808,000, an estimated growth in the HSP of $14,586,000. Ginder also stated the history of the MF/TD program indicates that approximately 40% of the children in the program improve and no longer need waiver services, approximately 30% die and approximately 20% need services beyond the age of 21. At the time of Ginder's report, there were 34 active cases of 18 to 20- year-old individuals, 19 of whom were ventilator dependent. Ginder stated these individuals are "likely to transition from MF/TD to HSP (if they select) at age 21." According to Ginder's calculations, if all these 19 persons received care at a cost of $17,000 per month, the net growth of the HSP program

10

would be $2,717,000 over three years.

The Department also argued that Michael had a trust fund that he could access to defray the difference between the cost of his in-home care as fixed by the preliminary injunction and the funds afforded under the HSP. Michael's mother (Jones) testified she had no discretion over the trust fund. Jones testified that she periodically received documentation from the trust and at the time of the hearing the trust contained $270,000. Jones stated deposits from an annuity are regularly made into the trust; she knew funds could be distributed for Michael's college tuition and insurance premiums; and she had never been refused a request for disbursement from the fund. The Department emphasized that if, during the appeal process, Michael necessarily required hospitalization, Medicaid would pay his hospital costs.

At the close of the hearing, the trial court stated its belief the scales of justice tipped in Michael's favor. The trial court granted Michael's motion and extended the preliminary injunction "until 30 days beyond the date the appellate court issues its judicial mandate regarding the interlocutory appeal in this case." The Department filed a second interlocutory appeal. Before this court are two interlocutory appeals: one which challenges the trial court's order granting Michael's motion for a preliminary injunction and requiring the Department to pay the arrearage to Trinity; and one which challenges the trial court's order temporarily extending the injunction.

## ANALYSIS

A preliminary injunction is an extraordinary remedy that is applicable only in situations where an extreme emergency exists and serious harm would result if it is not issued. Hartlein v. Illinois Power Co., 151 Ill. 2d 142, 156, 601 N.E.2d 720, 726 (1992). Four factors must be established before the trial court grants an injunction: 1) a clearly ascertainable right in need of protection; 2) the occurrence of irreparable harm without the injunction; 3) an inadequate remedy at law for the injury, and 4) likelihood

of success on the merits. Hartlein, 151 Ill. 2d at 156, 601 N.E.2d at 726-27. Controverted facts on the merits of the case are not decided in a ruling on a motion for a preliminary injunction. Hartlein, 151 Ill. 2d at 156, 601 N.E.2d at 727. A party seeking a preliminary injunction does not carry the same burden of proof required to prevail on the ultimate issue. People ex rel. White v. Travnick, 346 Ill. App. 3d 1053, 1060, 806 N.E.2d 270, 276 (2004).

Review of the propriety of a preliminary injunction order is generally for an abuse of discretion; however, when the trial court's ruling involves a question of law, the standard is *de novo*. People ex rel. White, 346 Ill. App. 3d at 1060, 806 N.E.2d at 276-77. On review, we must decide whether the plaintiff has demonstrated a *prima facie* case that there is a fair question as to the existence of the right claimed, the circumstances lead to a reasonable belief that the plaintiff probably will be entitled to the relief sought, and the matter should be kept in the status quo until the case can be decided on the merits. People ex rel. White, 346 Ill. App. 3d at 1060, 806 N.E.2d at 276. "Status quo" has been described as that situation which represents the last, actual, peaceable, uncontested status preceding the pending controversy. Postma v. Jack Brown Buick, Inc., 157 Ill. 2d 391, 397, 626 N.E.2d 199, 202-03 (1993).

Turning to the case at hand, the trial court, in granting Michael's motion for preliminary injunction, found the status quo to be maintained was funding by the Department for in-home care at the rate Michael had been receiving under the MF/TD program. The Department does not dispute that Michael will be irreparably harmed by a change in the status quo and that he has no adequate remedy at law. The Department asserts that Michael has no clearly ascertainable right in need of protection and, therefore, no likelihood of success on the merits. We confine our review to this disputed issue.

Michael asserts that under Title II of the ADA (42 U.S.C. §12132 (2000)), and section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794 (2000)), he has a right to be free from unnecessary

institutionalization and a right to placement in the most community-integrated setting appropriate to his needs. Because of their similarities, an analysis of the ADA applies with equal force to section 504. Radaszewski v. Maram, 383 F.3d 599, 607 ( 7th Cir. 2004). The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132 (2000). The ADA recognizes that the unjustified isolation of the disabled is discriminatory. Olmstead v. Zimring, 527 U.S. 581, 597, 144 L. Ed. 2d 540, 555-56, 119 S. Ct. 2176, 2185 (1999). Recognition that the unjustified isolation of the disabled is a form of discrimination reflects two evident judgments: institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participation in community life; and confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment. Olmstead, 527 U.S. at 600-01, 144 L. Ed. 2d at 558, 119 S. Ct. at 2187.

Under regulations promulgated to enforce the ADA, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. §35.130(d) (1998). The "most integrated setting appropriate" is a "setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, app. A, at 450 (1998). The "integration mandate" requires that qualified individuals be placed in community-based programs when the state's treatment professionals have determined community placement is appropriate, the placement is not opposed by the affected individual and the placement can be reasonably accommodated, taking into account the resources available to the state and the needs of others with mental disabilities. See Olmstead, 527 U.S. at 587,

13

144 L. Ed. 2d at 549-50, 119 S. Ct. at 2181 (deciding the proper construction of the ADA with respect to the requirements of placing mentally disabled persons in community settings rather than in institutions). States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide (Olmstead, 527 U.S. at 603 n.14, 144 L. Ed. 2d at 559 n.14, 119 S. Ct. at 2188 n.14), and are required to make "reasonable modifications in policies, practices, or procedures" that are necessary to avoid discrimination on the basis of disability (28 C.F.R. §35.130(b)(7) (1998)).

The integration mandate is not "boundless." Olmstead, 527 U.S. at 603, 144 L. Ed. 2d at 559, 119 S. Ct. at 2188. The state may argue as a defense that rather than reasonable, a modification would result in a "fundamental alteration" of the state's services and programs. Olmstead, 527 U.S. at 603, 144 L. Ed. 2d at 559, 119 S. Ct. at 2188; 28 C.F.R. §35.130(b)(7) (1998). Courts are to remain sympathetic to the fundamental alteration defense and give states "leeway" in administering services for the disabled. Olmstead, 527 U.S. at 605, 144 L. Ed. 2d at 560-61, 119 S. Ct. at 2189. An analysis of the state's fundamental alteration defense is a complex one, involving an array of factors. See Olmstead, 527 U.S. at 604-606, 144 L. Ed. 2d at 560-61, 119 S. Ct. at 2188-2190 (rejecting as unacceptable a "simple" comparison of community placement versus institutional confinement costs).

The ADA does not guarantee that each recipient of state medical benefits will receive a level of health care tailored precisely to the recipient's particular needs. Radaszewski, 383 F.3d at 609. Nevertheless, courts have recognized a state may violate the ADA when it refuses to provide an existing benefit to a disabled person that would enable that individual to live in a more community-integrated setting. Radaszewski, 383 F.3d at 609. Under Olmstead, the failure to provide Medicaid services in a community-based setting may constitute a form of discrimination. Townsend v. Quasim, 328 F.3d 511, 516-17 (9th Cir. 2003). Requiring a state to create an entirely new program, providing heretofore unprovided services to a disabled person, is not a reasonable modification; requiring a state to offer

14

services in a home or community-based setting that are available in an institution may be considered reasonable. Townsend 328 F.3d at 517-18. Nothing in Olmstead, or in the regulations promulgated under the ADA, conditions a claim under the ADA on proof that the services a plaintiff wishes to receive in a community-integrated setting exists in exactly the same form in the institutional setting. Radaszewski, 383 F.3d at 611.

In seeking a preliminary injunction, Michael asserted he has a right, under the ADA, to continue to receive nursing care in his home, the least expensive, most integrated setting appropriate to his needs. The Department asserts Michael's needs could be accommodated in a nursing home facility. This argument is belied not only by the detailed testimonies of Michael's mother, nurses and physician, but by the Department's own findings. Michael's mother, nurses and physician all indicated if Michael does not receive around-the-clock individual nursing care his only alternative is placement in a hospital. Furthermore, in a preliminary investigation, a caseworker found that Michael could not be safely accommodated within the present limits of the HSP program, and the Department's Director, in the final administrative decision, found Michael's evidence supported his assertion that absent the level of care he had been receiving at home under the MF/TD program, he would require hospitalization. The only evidence the Department has offered to the contrary are the statements of two nursing facility employees who, based on an indirect review of the statements of Michael's caregivers and without personally examining Michael, concluded the nursing facility by which they were employed could accommodate Michael's needs.

The stronger evidence supports a finding that the appropriate reference point for comparable costs for Michael's care is not a nursing home facility, but a hospital, where his need for constant monitoring and continuous skilled assistance could be accommodated. Michael cannot be left unattended for any amount of time and needs the attention of highly trained personnel. His needs are

15

acute and the potential for a medical crisis ever present. When the family attempted to locate personal assistance for Michael to supplement the HSP, they were unable to find anyone to assume "the risk." It is undisputed Medicaid would cover the cost of Michael's hospitalization, a cost more expensive than the in-home care Michael has been receiving.

In a sense, Michael is simply requesting that a service for which he would be eligible under Medicaid be provided in his home where he has heretofore received that type of care. Moreover, it is undisputed that the HSP provides funding, albeit limited under the ECR, for the same services Michael was receiving under the MF/TD program. Michael is not requesting a new program, but a modification of one the Department has in place. The Department's limited evidence on projected costs for individuals similar to Michael does not clearly establish what level of funding it considers would be necessary to accommodate individuals with disabilities comparable to those of Michael, or into which category it is placing him. Although it is evident the Department would have to increase the level of expenditures it would make under the existing HSP directive, this alone does not defeat Michael's claim. See Radaszewski, 383 F.3d at 614 (stating that if, as the plaintiff represented, it would cost the state no more and possibly less to care for the plaintiff's son at home than it would to care for him in an institution, it would be difficult to see how requiring the state to pay for at-home care would amount to an unreasonable, fundamental alteration of its programs and services). It is likely that the most integrated setting appropriate to Michael's needs is one the Department can reasonably accommodate, particularly when it is evident the only alternate is to place Michael in the much more expensive setting of a hospital intensive care unit, a situation his home caregivers have, for the most part, heretofore prevented.

Michael is a qualified individual with a disability who has a right to participate in the Department's programs in the most integrated setting appropriate to his needs. It has been

16

demonstrated that the most integrated setting for Michael is his home, where he has thrived for 13 years. Michael has handled heroically and benefitted significantly from participation in home and community life. His everyday activities heretofore include interacting with family and friends, participating in social and cultural events, seeking educational advancement and preparing to become economically independent. Michael, his family and his caregivers are enthusiastically in favor of his continued placement in the home. The evidence strongly suggests that if placed in an institutional environment, with the resultant loss of the benefits of his integrated setting, Michael will cease to flourish as he has at home. It has also been demonstrated by the Department that it is possible to accommodate Michael's needs at home. Michael's condition has not changed, only his age has changed. It seems likely the Department can accommodate the needs of Michael and others like him with reasonable modification to existing programs. The cost of caring for Michael at home would not exceed the cost of the comparable facility capable of meeting his needs, the intensive care unit of a hospital. It is possible that at a full trial, the Department may be successful in supporting a fundamental alteration defense. However, controverted facts on the merits of the case are not decided in a ruling on a motion for a preliminary injunction; here, we are evaluating the probability of Michael's success on the merits and we consider it high. For these reasons, we conclude the trial court did not err in ruling that preliminarily, the Department maintain the status quo and continue to allow Michael in-home care at the cost the Department provided to him under the MF/TD service program.

The Department also argues on appeal that under the doctrine of sovereign immunity, the trial court did not have the jurisdiction to order the Department to pay the amount owed to Trinity for the difference between what Trinity had been receiving for Michael's care under the MF/TD program and the amount it received under the Department's HSP service order until the time the trial court entered the preliminary injunction order. On this issue, we agree with the Department. The State Lawsuit

Immunity Act (745 ILCS 5/1 *et seq.* (West 2004)) (the Act), with certain exceptions, provides the State immunity from suit as a party or defendant in any court. Board of Education of the City of Peoria, School District No. 150 v. Sanders, 150 Ill. App. 3d 755, 758, 502 N.E.2d 730, 732 (1986).  A claim that potentially subjects the State to liability is the exclusive jurisdiction of the Illinois Court of Claims. In re Lawrence M., 269 Ill. App. 3d 253, 256, 645 N.E.2d 1069, 1071 (1995).

In determining whether an action is brought against the State, it is the issues involved and the nature of the relief sought that are controlling. In re Lawrence M., 269 Ill. App. 3d at 256, 645 N.E.2d at 1071. Claims for present relief against the State are barred by sovereign immunity; claims for prospective relief, such as an injunction to prevent a State official from taking action in excess of delegated authority or to perform a recognized duty, are not barred under sovereign immunity. Welch v. Illinois Supreme Court, 322 Ill. App. 3d 345, 358, 751 N.E.2d 1187, 1198 (2001); In re Lawrence M., 269 Ill. App. 3d at 257, 645 N.E.2d at 1071. Where, as in the instant case, a claim against the State is essentially a claim for payment of services rendered, which the State challenges as a debt it does not owe, the suit is barred under sovereign immunity and the trial court lacks the jurisdiction to decide the matter. Children's Memorial Hospital v. Mueller, 141 Ill. App. 3d 951, 955-56, 491 N.E.2d 103, 106 (1986) (finding a suit founded upon a contract with the State and which seeks to impose a monetary obligation on the State is within the exclusive jurisdiction of the Court of Claims).  For these reasons, we conclude the trial court did not have jurisdiction to order the Department to pay Trinity the amount due and that portion of the trial court's order must be vacated.  Our decision does not address whether Michael has a claim against the Department for the debt owed to Trinity; we conclude only that the circuit court is not the appropriate forum for this claim.

For the foregoing reasons, the judgment of the circuit court of Whiteside County is affirmed in part and vacated in part.

Affirmed in part and vacated in part.

CARTER, J., concurs.

JUSTICE McDADE, specially concurring in part, dissenting in part:

The majority has found that the trial court did not err in ruling that preliminarily, the Department must maintain the *status quo* and continue to allow Michael in-home care at the cost the Department provided to him under the MF/TD service program and that the trial court did not have jurisdiction to order the Department to pay Michael's past due home health care bills. Because I disagree with the majority's second finding, I respectfully dissent.

In my opinion the nature of the relief sought in this case is not "a claim for payment of services rendered" against the Department or DHS. Rather, the principal relief Jones seeks is maintenance of adequate funding for his in-home medical care. Therefore, I would find that sovereign immunity does not bar the trial court's order.

"In a proper case, the court may be authorized to grant a preliminary injunction ***or other appropriate preliminary relief*** to maintain the *status quo* during the pendency of an action for declarative relief." (Emphasis added.) *Millikan v. Jensen*, 4 Ill. App. 3d 580, 584, 281 N.E.2d 401, 404 (1972). In this case, the "last actual, peaceable, uncontested status preceding the controversy" (*Limestone Development Corp. v. Village of Lemont*, 284 Ill. App. 3d 848, 853, 672 N.E.2d 763, 767 (1996) (defining *status quo*)) was that time when defendants provided that funding, not after it terminated funding. The circuit court's order seeks to maintain that status by ordering it to pay the outstanding bills and to continue to pay them. Absent the court's order, the parties' status would change dramatically. The court's order effectively and correctly maintains the *status quo* and should be affirmed.

The majority relies upon *Children's Memorial Hospital v. Mueller*, 141 Ill. App. 3d 951,

955-56, 491 N.E.2d 103, 106 (1986), to hold that sovereign immunity applies in this case. However, there, the court held that "a suit to compel a State official to perform his duty according to statutory authority or regulations is a suit against the ***State officer***, not against the State itself. " (Emphasis in original.) *Mueller*, 141 Ill. App. 3d at 955, 792 N.E.2d at 105. In this case, the nature of the relief Jones seeks is for defendants to comply with their obligation under the State Medicare program, the ADA, and section 504 of the Rehab Act to provide him with their services in a non-discriminatory fashion. Jones has alleged that when defendants stopped paying Trinity under the MF/TD program they were acting in a discriminatory fashion in violation of the statutes. Any deficiency in the amount Trinity received under the Department's HSP service order until the time the trial court entered the preliminary injunction order was, therefore, caused by a state officer not performing his duty in accordance with statutory authority. The order to pay the past amount due is, in effect, an order that the Department should have continued funding for in home care in accordance with the statutes. In other words, the order maintains the *status quo*. Therefore, under *Mueller*, sovereign immunity does not apply and the court could appropriately order payment of the past due bills in the preliminary injunction.

For all of the foregoing reasons, I would hold that the circuit court had jurisdiction to order payment of Jones's past due bills for in-home medical care. Accordingly, I respectfully dissent from that portion of the majority's order.

20