SIXTH DIVISION
June 20, 2008

No. 1-07-0860

| | | |
|---|---|---|
| LUMBERMEN'S MUTUAL CASUALTY COMPANY, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff and Counterdefendant-Appellant, | ) ) | |
| | ) | No. 02 CH 13769 |
| v. | ) ) | |
| GLORIA SYKES, | ) ) | Honorable Mary Mulhern, |
| Defendant and Counterplaintiff-Appellee. | ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

This is a case concerning coverage under a homeowner's insurance policy. In early 2001, homeowner Gloria Sykes discovered water entering her home and submitted a claim for water damage under her homeowner's insurance policy with Lumbermen's Mutual Casualty Company (Lumbermen's). Lumbermen's paid the claimed damages and closed the file. Subsequently, in November 2001, Sykes reported toxic mold growth in her home which she alleged was a result of the prior occurrence. She later alleged that due to this mold growth, her home became uninhabitable and she was forced to move out. After sending various experts to Sykes' home to investigate the damage over the course of several months, Lumbermen's denied coverage. It filed a declaratory judgment action, seeking a ruling that it was not required to pay Sykes for the mold-related damage under the terms of her policy. Sykes countersued, alleging, among other things, that Lumbermen's had breached its contract with her by refusing to pay and that waiver

and estoppel prevented it from asserting non-coverage as a defense.

The trial court granted summary judgment for Sykes on count I of her counterclaim, breach of contract, and on count II, estoppel. It also issued a preliminary mandatory injunction ordering Lumbermen's to pay Sykes' additional living expenses that she incurred due to being unable to stay in her home. On appeal, Lumbermen's challenges the injunction and the partial summary judgment upon which it is predicated. For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

On July 26, 2002, Lumbermen's filed its complaint in the circuit court seeking declaratory relief against Sykes. In its complaint, it avers that it issued a homeowner's insurance policy to Sykes effective from June 5, 2000, to June 5, 2001. It further avers that in February 2001, Sykes notified Lumbermen's that her house had sustained water damage as a result of melting snow in January 2001; Lumbermen's paid Sykes for that damage. Subsequently, in November 2001, Sykes notified Lumbermen's that she had mold in her home. Lumbermen's thereupon sent various experts to investigate the alleged mold damage, meanwhile sending multiple letters to Sykes notifying her that Lumbermen's was reserving its rights under her policy. The complaint then alleges that after the investigation, Lumbermen's concluded that Sykes' claim for mold damage was not covered under her policy, and it sent her a letter denying coverage on July 24, 2002. Thus, Lumbermen's requested that the court declare that it was not required to pay Sykes' claim.

Attached to the complaint was a copy of Lumbermen's July 24, 2002, letter to Sykes. In

the letter, Lumbermen's stated that its experts found "water infiltration and wood decay [that] have been occurring over a period of many years prior to the December 2000 ice damning [*sic*] occurrence."[1] It further stated that "the observed conditions of mold growth and fungal decay have been caused by water infiltration... due to defective roof construction and not due to conventional ice damming conditions." According to Lumbermen's, this kind of long-term water infiltration caused by design defects in the house was not within the scope of the policy. The letter proceeded to list various policy conditions which purportedly showed that the damage was excluded from coverage. In particular, the letter stated that "the damage pre-dated the inception of your insurance policy."

On October 21, 2002, Sykes filed a counterclaim against Lumbermen's in ten counts, of which Counts I and II are at issue in this appeal. Her complaint recites the following preliminary allegations.

In February 2001, due to heavy snowfall, ice dams formed on the roof of Sykes' house. Sykes alleges that these ice dams caused water to enter her house and cause damage, and in turn, this water intrusion eventually caused the house to become contaminated with toxic mold. Sykes

---

[1] The parties do not define the term "ice damming." However, the online encyclopedia Wikipedia defines an ice dam as a buildup of water behind a blockage of ice. *Ice dam – Wikipedia, the free encyclopedia*, *available at* http://en.wikipedia.org/wiki/Ice_dam (last visited June 10, 2008). It further states that when ice damming occurs on the roof of a house in the winter, the accumulated ice prevents melted snow from draining properly off the roof, which can result in, among other things, a leaking roof or rotting timber.

notified Lumbermen's of the water damage. Lumbermen's determined that the water damage was a covered loss under Sykes' policy and paid for various repair costs. It closed its file in July 2001. Because Sykes had filed "too many claims," Lumbermen's declined to renew her policy for the following year.

Sykes further states that in November 2001, Lumbermen's began to investigate Sykes' claims of mold at her house. Experts hired by Lumberman's conducted an inspection of the house on January 22, 2002, and they confirmed the presence of mold in the house, likely caused by water accumulation due to roof leaks. Sykes learned of the possible dangerousness of the mold situation in February 2002, from speaking with representatives of one of these hired experts. Sykes then relocated to a hotel. Also in February 2002, Sykes signed an authorization form to allow Purofirst, a preferred company of Lumbermen's, to begin remediation work on her house and on the contaminated personal property within.

Sykes then avers that on March 7, 2002, she received a letter from Lumbermen's stating that the insurer required additional information to determine whether her claim was covered. However, Sykes alleges that on March 14, 2002, Lumbermen's admitted that the mold was a result of a covered loss – namely, the ice dam event of January 2001 – and that it would therefore be paid for. As evidence, she refers to an attached March 14, 2002, letter sent to Sykes by Susan Johansen, Lumbermen's home office claims consultant. In the letter, Johansen said:

> "I know that various people, including myself, have indicated to you that we need to determine what is leaking and why. I know that we paid to replace part of your roof due to ice dams, but since it was leaking this year in the same spot when there was snow

on the roof, then someone missed something. If the cause of the roof damage is due to the ice dams, then there is coverage under the policy to repair the damage to the roof." Johansen then said that Lumbermen's would compensate Sykes for various personal property items of hers that would be discarded, as well as for necessary increases in living expenses that she had incurred due to being out of her home. However, regarding a small area of mold in the basement, Johansen said, "[Y]ou indicated that you would take care of the repairs in this area as it was not related to the ice dam related repairs." She also said:

"As you are aware, the policy does not insured [*sic*] for loss caused by, among other things, wear and tear, deterioration, wet or dry rot, mold, birds, insects, etc. In this claim, the mold was a result of a covered loss (the ice dams) and therefore it was covered.

Let me give you an example of mold that would not be covered under this claim. You advised out this morning that the remediators found mold in an area that was not related to the ice dams. (You stated that you would take responsibility for it as it is not part of this claim but is probably related to the water loss from last summer/fall.) That is an example of mold damage that is not covered by our policy or this claim as it is unrelated to the ice dams.

It is our intent to remediate the mold in your home from the ice dam of January 2001 and get you back into your home as soon as possible. *** [L]et me assure you that if mold is found outside the ice dam areas, we will address the cause of that mold and let you know if it is covered or not."

Sykes alleges that, as a result of this letter, she believed that her policy would cover at least a

portion of her losses, and possibly all her losses, as well as her additional living expenses.

Lumbermen's continued to investigate the cause of the mold damage through the following months. In addition, it requested Sykes' compliance in being present as her property was removed from the house in April 2002, and it requested that she appear for an examination under oath and produce certain documents in May 2002. Sykes contends that these actions further lulled her into a belief that she was covered under her policy and that the damage to her home would be repaired. Nevertheless, on July 24, 2002, Lumbermen's denied her claim. Five days later it informed the hotel where she was staying that it would not be paying her hotel expenses past July 31, 2002. Sykes finally alleged that the remediation began by Lumbermen's vendor was never completed, the microbial contamination was never removed, and her home remained uninhabitable to the present day.

Count I of Sykes' counterclaim, predicated upon the foregoing allegations, seeks damages on the theory that Lumbermen's breached its contract with her by refusing to pay her the sums due under her insurance policy for the mold damage. Count II avers that Lumbermen's was estopped from denying coverage, because Sykes relied to her detriment on statements by Lumbermen's that mold damage in areas where ice damming had previously occurred would be covered under her policy. The remaining counts, which are not material to this appeal, seek relief predicated upon allegations of intentional and reckless infliction of emotional distress, negligence, and consumer fraud, as well as seeking relief under the Illinois Insurance Code.

Attached to Sykes' counterclaim is a report dated February 12, 2001, which was prepared for Lumbermen's by ICA, Inc., a company that provided site inspection services for

Lumbermen's. Regarding the water damage reported by Sykes in February 2001, the report states that the damage was a result of ice damming and was covered under her policy. It also recommends that the water damaged areas be treated with mildecide to prevent the spread of mold or mildew.

Also attached to Sykes' counterclaim is a copy of a February 14, 2002, report prepared for Lumbermen's by Engineering & Fire Investigations (EFI), which was another of the parties hired by Lumbermen's to perform inspection of Sykes' home. In the report, EFI states that "[r]oof leaks from the ice or from other damage has most likely provided an environment conducive for mold growth." It also provides various suggestions for remediation of the property.

In its answer to Sykes' counterclaim, Lumbermen's admits, among other things, that regarding Sykes' claim for damage related to the early 2001 ice dam event, "water entered the interior of the insured dwelling and caused some damage" and "[Lumbermen's] determined that some damage was covered under the insurance policy."

On July 6, 2006, Sykes filed a motion for partial summary judgment on the issue of Lumbermen's liability under the breach of contract count (count I) and estoppel count (count II) of her counterclaim, as well as for summary judgment against Lumbermen's on its original complaint for declaratory judgment. In her brief in support of this motion, Sykes contends that the uncontested evidence shows that Lumbermen's waived any defense of noncoverage, because it admitted both in communications with her and in its internal correspondence that the mold

damage to her house was covered under her policy.[2] The documentary evidence she attaches in support of this contention shall be discussed below. Sykes also contends that Lumbermen's is estopped from raising any defense of noncoverage, since Sykes relied to her detriment on Lumbermen's assurances of coverage by moving out of her house, allowing Purofirst to begin extensive remediation on the house, and allowing her personal possessions to be removed (and, in some cases, destroyed). Sykes states that she would not have allowed this were it not for her belief in Lumbermen's statements that her policy would cover the mold damage. Thus, Sykes argues, the undisputed facts show that under the doctrines of waiver and estoppel, Lumbermen's is required as a matter of law to pay for all mold damage to her home and personal property.

In support of her motion, Sykes attaches her affidavit dated July 5, 2006. In her affidavit, she avers: "On or about February 19, 2002, *** [Lumbermen's] told me that I was covered under my homeowner's insurance policy with them, that my home would be remediated, damaged property replaced, additional living expenses paid ***." She does not specify which agents of Lumbermen's relayed these promises to her, nor does she cite any specific language or state whether the promises were oral or written. According to her affidavit, she then moved out of her house upon request by Johansen and allowed Purofirst to begin remediation work. She further states:

---

[2] Although count II of her complaint is simply labeled "Estoppel" and does not make reference to waiver, Sykes argues that the facts necessary to establish waiver have been sufficiently pled for the court to properly consider the issue. Lumbermen's does not contest this point on appeal.

"I would never have allowed this remediation work to begin had [Lumbermen's] not told me that they would pay for the remediation and complete the remediation and get me back in my home. I would never have allowed this work to be done had [Lumbermen's] not told me and through its conduct, lead me to believe I was covered under the Policy for the mold damage to my home and personal property."

She says that, upon denial of her claim in July 2002, Lumbermen's and its agents left her home without completing the remediation. She avers that the home is still uninhabitable, with mold and torn up floors and walls as a result of the remediation work, and her contaminated personal property has not been cleaned or replaced.

Sykes also attaches a series of letters, e-mails, and expert reports in the chronological order of their creation within the timeframe of her complaint. The first such document is a report by L.J. Shaw, one of the vendors hired by Lumbermen's, which conducted a site inspection of Sykes' home and subsequently issued an inspection report dated January 23, 2002. Under the section "Cause of Loss," L.J. Shaw states that Sykes' claim "involves mold as related to the ice damming," referring to her ice dam claim in early 2001. L.J. Shaw also states that "it is likely that we will find mold in all the other areas of the home that suffered water damage from the ice damming."

In addition, Sykes attaches e-mails between claims consultant Susan Johansen and Lumbermen's employee Joey Borsuk. In the first e-mail, sent January 28, 2002, Johansen says to Borsuk, "Looks like we have mold relating to the ice damage but I am wondering about a couple of things." Johansen goes on to ask questions regarding possible reasons for denying coverage,

including: "Are we sure that the damage in the basement is related to the ice dam and not water seeping through the foundation?" In a second e-mail, Borsuk contacts Johansen on January 30, 2002, to say, "The closet has mold that no one knew about – if it is related to the ice dam from 1/01/01 – we need to repair and remediate the mold under the claim. The big question that the IA needs to answer is: What caused the mold? And he has to go beyond the question of water! We need to know if it was the ice dam and we didn't see the damage." In a third e-mail, on February 18, 2002, Johansen tells Borsuk that Sykes should be told that the remediation bid "will be revised if more covered mold is found."

Additionally, Sykes attaches a letter, dated March 7, 2002, sent from Borsuk to Sykes in which Borsuk says, "At this time, new information has been brought to our attention and we do not have sufficient information to determine the extent of coverage available to you under your policy." He then cites exclusions in her policy for wear and tear, latent defects, and defective design, as well as a condition stating that only property damage occurring within the policy period is covered. He concludes by stating, "This letter will serve to advise you that any actions taken to date to investigate and/or attempting to adjust any claim arising out of the above captioned matter are not to be construed as a waiver of any of the terms, requirements, or conditions of your insurance policy, nor should this action be construed as either an admission or denial of our company's liability, or a waiver by it of any right, claim or defense thereunder."

Sykes next attaches more e-mail correspondence between Johansen and Borsuk. On March 11, 2002, Johansen e-mails Borsuk and says, "we know we have visible mold from what we have determined is a covered loss." On March 19, Borsuk e-mails her to tell her to make sure

Sykes' hotel knows that Lumbermen's is still paying Sykes' bill. "We have basically committed to about 2 months as I recall that was what we thought it would take to do the remediation and buildback," he says. "I expect we will be on the ALE [additional living expenses] until we resolve the issue of coverage."

In further support, Sykes submits a April 1, 2002, letter from Lumbermen's coverage attorney to Johansen in which the attorney states that Lumbermen's "has acknowledged, at least in part, a covered water loss, resulting in mold." However, the attorney also states that "numerous policy provisions *** may apply" and recommends that a new reservation of rights letter be sent to Sykes.

Sykes attaches a second inspection report, dated July 16, 2002, from Engineering Systems, Inc., an outside adjuster hired to investigate the cause of the mold in Sykes' house. The report states that Sykes' home "had experienced water infiltration through the roof system, walls and windows, and basement," and that this roof leakage "has been ongoing for many years *** during periods of ice damming and rain." This language is quoted in Borsuk's July 24, 2002, letter to Sykes denying coverage.

In its reply to Sykes' motion for summary judgment, Lumbermen's does not dispute the veracity of Sykes' documentary evidence; rather, it contends that these documents did not amount to waiver or estoppel. It also alleges that six days after Sykes made her phone call to Lumbermen's informing it of a mold problem in her house on November 2, 2001, Borsuk sent her a reservation of rights letter, a copy of which is attached to its response. Lumbermen's further avers that while various payments were made to Sykes during the course of its

investigation into the cause of the mold, these payments were accompanied by letters stating that they were made under a reservation of rights. Copies of these letters are also attached. Lumbermen's contends that these documents, when combined with the documents presented by Sykes, show that Lumbermen's reserved its rights rather than waiving them, and that no basis for estoppel was engendered because any reliance by Sykes on a belief that coverage would be provided was unreasonable. Accordingly, it requests that Sykes' motion for summary judgment be denied.

A copy of the letter that Borsuk sent to Sykes on November 8, 2001, is attached to the response. It reads, in relevant part:

> "On February 05, 2001, we first received notice of the above-mentioned incident. Since that time we have been advised that you now have mold. At this time, we do not have sufficient information to determine whether you are covered under this policy for this loss.
>
> This is to advise that any actions taken to date in investigation and/or attempting to adjust any claim arising out of the above captioned matter are not to be construed as a waiver of any of the rights of this company under the above captioned policy."

Likewise, copies of three of the aforementioned payment letters are attached, each stating that payment is made to Sykes under "full Reservation of Rights."

Lumbermen's also attached a copy of a one-page form authorizing Purofirst to begin property remediation. It is signed by Sykes and dated February 20, 2002. It states, in relevant part, "I (we) understand that Purofirst is working for me (us) and not the insurance company,

adjuster, and/or agent. *** I (we) agree to pay Purofirst directly for any amount not covered by insurance." Under that paragraph is a handwritten statement that reads: "(WRITTEN PROPOSAL FOR ANYTHING INSURANCE WON'T COVER)." Sykes' initials are signed next to the statement. An excerpt from Sykes' June 7, 2006, deposition testimony is also attached to Lumbermen's response. In that excerpt, Sykes testifies that she read and signed the Purofirst authorization letter and that she wrote the aforementioned handwritten statement on it.

On January 23, 2007, the trial court issued an order granting summary judgment for Sykes on count II of her counterclaim, finding that both waiver and estoppel precluded Lumbermen's from denying coverage to Sykes for the mold damage to her house. (The court subsequently amended this order to add summary judgment for Sykes on Count I, her breach of contract claim, as the court's finding of waiver and estoppel would preclude Lumbermen's from prevailing on the breach of contract claim.) The trial court began by noting that, in determining whether waiver or estoppel barred Lumbermen's from denying coverage, the actual cause of the mold damage was irrelevant; rather, the primary issue was Lumbermen's conduct in responding to Sykes' claim. With respect to waiver, the trial court found that Lumbermen's had admitted coverage both in internal correspondence between Borsuk and Johansen and in Johansen's March 14, 2002, letter to Sykes. In light of these repeated admissions, the court said that regardless of the letters in which Lumbermen's purported to reserve its rights, it would be "manifestly unjust" to permit it to assert the defense of noncoverage. It thus found that Lumbermen's actions, when viewed as a whole, constituted waiver. With respect to estoppel, the court found that Sykes had established that she reasonably relied upon Lumbermen's statements that the mold damage would

be covered, and she suffered as a result of that reliance, so Lumbermen's was equitably estopped from denying coverage.

Sykes subsequently filed a motion for immediate injunctive relief, requesting that the court order Lumbermen's to pay her additional living expenses on a going-forward basis until the damage to her home was repaired. These expenses were to include Sykes' hotel bills as well as some extra money for general living expenses. In support of this motion, Sykes alleged that she did not have an adequate remedy at law, because she did not have the money to rent lodging elsewhere or otherwise pay for her own residence. She further alleged that, since Lumbermen's ceased paying her hotel bills in August 2002, she had been "forced" to move in with her mother.

Based on its findings of waiver and estoppel, the trial court granted Sykes' motion for immediate injunctive relief on March 9, 2007. Subsequently, in an order dated March 29, 2007, after an evidentiary hearing to determine the amount of additional living expenses that Lumbermen's should be required to pay, the court issued a preliminary mandatory injunction ordering Lumbermen's to pay her the sum of $11,241.29. In reaching that figure, the court first found that Sykes' monthly expenses consisted of $850 in rent, $120 in cell phone charges, and $275 in lost rent payments (as Sykes had previously been renting out a portion of her home). It also found that Sykes only had $11,241.29 of remaining coverage available under her policy for additional living expenses.[3] The court then calculated that the sum total of Sykes' living expenses from July 31, 2002 (the date that Lumbermen's stopped paying them due to its denial of

---

[3] Sykes disputes this figure in her brief, averring that she had purchased additional coverage which was not taken into account in the trial court's calculations.

coverage), to the present exceeded the amount of remaining coverage. Therefore, it ordered Lumbermen's to pay her $11,241.29 as the full amount remaining under her policy.

Lumbermen's filed the instant interlocutory appeal pursuant to Supreme Court Rule 307(a) (Ill. 2d R. 307(a)), seeking reversal of both the grant of summary judgment and the grant of interlocutory relief with respect to Sykes' additional living expenses.

## II. ANALYSIS

On appeal, Lumbermen's argues that the trial court erred in granting summary judgment to Sykes; it contends that the documents presented before the court demonstrate that no waiver or estoppel occurred or, in the alternative, that genuine issues of material fact exist with respect to those issues. In addition, Lumbermen's contends that the trial court abused its discretion in granting injunctive relief to Sykes and ordering Lumbermen's to pay her living expenses, because it contends that Sykes did not demonstrate that she lacked an adequate remedy at law, as is necessary for injunctive relief.

Summary judgment is proper where, "when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *General Casualty Insurance Co. v. Lacey*, 199 Ill. 2d 281, 284, 769 N.E.2d 18, 20 (2002), citing 735 ILCS 5/2-1005(c) (West 2006). A genuine issue of material fact exists where the facts are in dispute or where reasonable minds could draw different inferences from the undisputed facts. *In re Estate of Ciesiolkiewicz*, 243 Ill. App. 3d 506, 510, 611 N.E.2d 1278, 1282 (1993). If the movant presents facts that, if uncontradicted, would entitle him or her to

judgment as a matter of law, then the nonmovant may not rest on the pleadings to create a genuine issue of material fact, but must instead present some factual evidence that would arguably entitle it to favorable judgment. *Pecora v. County of Cook*, 323 Ill. App. 3d 917, 933-34, 752 N.E.2d 532, 545 (2001); *Rotzoll v. Overhead Door Corp.*, 289 Ill. App. 3d 410, 418, 681 N.E.2d 156, 161 (1997). We review the trial court's grant of summary judgment *de novo* (*Hartford Fire Insurance Co. v. Everest Indemnity Insurance Co.*, 369 Ill. App. 3d 757, 761, 861 N.E.2d 306, 310 (2006)), while we review the trial court's interlocutory order granting injunctive relief under an abuse of discretion standard. *Board of Education of Dolton School District 149 v. Miller*, 349 Ill. App. 3d 806, 811, 812 N.E.2d 688, 693 (2004).

### A. Regarding the Trial Court's Finding of Waiver and Estoppel

Although the terms "waiver" and "estoppel" are sometimes conflated, particularly in the insurance context, they are actually distinct legal doctrines. *Twin City Fire Insurance Co. v. Old World Trading Co.*, 266 Ill. App. 3d 1, 12, 639 N.E.2d 584, 591 (1993). Waiver focuses exclusively on the conduct of the insurer, while estoppel focuses on the conduct of the insured in response to representations made by the insurer. *Twin City*, 266 Ill. App. 3d at 12, 639 N.E.2d at 591. Hence, we shall consider their application to the case at hand separately. A finding of either waiver or estoppel is sufficient to sustain the judgment. See *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486, 499, 475 N.E.2d 872, 878-79 (1985) (finding that insurer did not waive policy defense, but recognizing that insured might be able to show that insurer was estopped from asserting policy defense).

### 1. Waiver

Lumbermen's contends that it did not waive its right to deny coverage to Sykes for two key reasons: first, it argues that it repeatedly reserved its rights and did not admit coverage either in its internal correspondence or in its correspondence with Sykes; second, it argues that its statements during the course of its investigation into the source of the mold cannot legally constitute waiver, because it did not yet have knowledge of all the relevant facts at the time it made those statements. Furthermore, it contends that even if its internal correspondence does constitute admission of coverage, it would be an "evidentiary admission" only, and the weight to be given those admissions should be judged by the finder of fact rather than as a matter of law.

In assessing these contentions, we are mindful that waiver is "an equitable principle invoked to further the interests of justice whenever a party initially relinquishes a known right or acts in such manner as to warrant an inference of such relinquishment." *Mollihan v. Stephany*, 52 Ill. App. 3d 1034, 1041, 368 N.E.2d 465, 470 (1977). It is a unilateral act, and detrimental reliance by the insured is not required. *Brochu*, 105 Ill. 2d at 499, 475 N.E.2d at 878; *Chatham Corp. v. Dann Insurance*, 351 Ill. App. 3d 353, 365, 812 N.E.2d 483, 494 (2004). (To the extent there was detrimental reliance, an issue of estoppel would arise, as shall be discussed below.) Waiver may be either express or implied; "implied waiver arises when conduct of the person against whom waiver is asserted is inconsistent with any intention other than to waive it." *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 326, 821 N.E.2d 269, 282 (2004); see *Liberty Mutual Insurance Co. v. Westfield Insurance Co.*, 301 Ill. App. 3d 49, 53, 703 N.E.2d 439, 442 (1998) (finding waiver on the basis that liability insurer's actions were inconsistent with any other intention but to waive its rights to challenge the reasonableness of a settlement reached

by the insured).  For instance,

> "If the insurance company is fully advised of the facts bearing on its policy defense and
> does not then insist on noncoverage but recognizes the continued validity of the policy by
> requiring the insured to go to the trouble and expense, if any, of preparing proofs of loss
> and related matter, an intention to waive the policy defense would follow."  *Kenilworth*
> *Insurance Co. v. McDougal*, 20 Ill. App. 3d 615, 620, 313 N.E.2d 673, 677 (1974), cited
> with approval in *Vasilakis v. Safeway Insurance Co.*, 46 Ill. App. 3d 369, 374, 361
> N.E.2d 1, 3 (1977).

Strong proof is not required to show a waiver of a policy defense.  Rather, the insured need only demonstrate such facts as would make it "unjust, inequitable or unconscionable" to allow the insurer to assert the defense.  *Vasilakis*, 46 Ill. App. 3d at 374,  361 N.E.2d at 3, citing *Kenilworth*, 20 Ill. App. 3d at 620, 313 N.E.2d at 677 (1974).  Questions of waiver and estoppel are left to the trier of fact where the material facts are in dispute or where reasonable people might draw different conclusions from the evidence.  *Aetna Casualty & Surety Co. v. Oak Park Trust & Savings Bank*, 168 Ill. App. 3d 1000, 1004, 523 N.E.2d 117, 119 (1988).  However, when the material facts are undisputed and only one reasonable inference may be drawn from them, waiver and estoppel may be determined as a matter of law.  *Home Insurance*, 213 Ill. 2d at 326, 821 N.E.2d at 282; *Aetna Casualty*, 168 Ill. App. 3d at 1004, 523 N.E.2d at 120 (affirming trial court's grant of summary judgment against defendant on issue of estoppel, because there was no dispute about the conduct of plaintiff that defendant claimed amounted to estoppel, and the court found that defendant had not established the elements of estoppel as a matter of law);

No. 1-07-0860

*Strom International, Ltd. v. Spar Warehouse & Distributors, Inc.*, 69 Ill. App. 3d 696, 703-04, 388 N.E.2d 108, 113-14 (1979) (affirming trial court's decision to reject plaintiff's waiver and estoppel claims at the summary judgment stage when plaintiff could not point to any facts in the record that would support a theory of waiver or estoppel).

Before we can determine whether Lumbermen's has waived its defense of noncoverage, it is first necessary to determine the grounds upon which Lumbermen's is attempting to assert noncoverage. Sykes contends in her brief that Lumbermen's denied coverage "based upon a finding that there was never an ice dam event in the first place." In doing so, Sykes misrepresents Lumbermen's argument. Lumbermen's has not sought to establish that no ice damming occurred, either in its July 24, 2002, letter denying coverage or in its arguments before this court. Indeed, any such attempt would be futile, given Lumbermen's consistent and repeated admissions that a covered ice dam event did occur in early 2001.[4] Rather, Lumbermen's contends that the mold damage in Sykes' house is a result of noncovered causes rather than a result of the covered ice damming. This is evidenced, for instance, by its July 24, 2002, letter to Sykes stating that the mold was caused by "water infiltration and wood decay [that] have been occurring over a period of many years prior to the December 2000 ice damning [*sic*] occurrence." As a result, contrary to Sykes' contentions, Lumbermen's statements regarding coverage for

[4] Although examples of this abound in the record, one will suffice: In its answer to Sykes' counterclaim, with respect to Sykes' claim for damage related to the ice dams, Lumbermen's says, "Plaintiff admits that it determined that some damage was covered under the insurance policy."

-19-

damages attributable to the ice dam event, as well as its actions in paying for her ice damming claim in early 2001, do not operate as an automatic waiver of the defense of non-coverage with respect to the mold damage that Sykes reported in November 2001.

Lumbermen's first argument is that, contrary to Sykes' contention, it did not admit coverage, but instead repeatedly reserved its right to deny coverage if it found out that the mold damage to Sykes' house was caused by a noncovered event. Sykes, on the other hand, argues that Johansen's March 14, 2002, letter to Sykes, as well as the internal e-mails speaking about Sykes' claim, constitute a clear admission that the mold damage is covered. Both sides are partially correct. A plain reading of the documents shows that Lumbermen's admits that the mold damage is covered to the extent that it results from the ice dam incident in early 2001. The clearest statement to this effect is in Johansen's March 14, 2002, letter, where she tells Sykes, "If the cause of the roof damage is due to the ice dams, then there is coverage under the policy to repair the damage to the roof." Such a statement is entirely inconsistent with any intention to deny coverage for that portion of the mold which can be attributed to the 2001 ice dams. See *Home Insurance*, 213 Ill. 2d at 326, 821 N.E.2d at 282.

Furthermore, in the same letter, Johansen admits that at least some of the mold damage falls into this category: "In this claim," she says, "the mold was a result of a covered loss (the ice dams) and therefore it was covered." This admission is corroborated by the e-mails between Johansen and Borsuk. In her February 18, 2002, e-mail, Johansen states that "covered mold" has been found, and on March 11, she again tells Borsuk that the mold results "from what we have determined is a covered loss."

However, Lumbermen's never says anything to indicate that all the mold in Sykes' home is covered. On the contrary, it repeatedly states that there is no coverage for mold which resulted from noncovered causes rather than from the ice dam event of early 2001. Johansen is explicit about this in her March 14, 2002, letter to Sykes, informing her that mold found in areas unrelated to the ice dams is not covered under the policy. She also gives Sykes a nonexhaustive list of losses that would not be covered. This is consonant with the multiple reservation of rights letters that Lumbermen's sent to Sykes, informing her that there would be no payment for damage that lay outside the terms of her policy. This concern is also reflected in the e-mails between Johansen and Borsuk: in Johansen's January 28, 2002, e-mail, as well as Borsuk's January 30 reply, the need to determine the cause of the mold in order to determine the proper scope of coverage is emphasized.

Hence, the evidence in the record fails to demonstrate any waiver of the policy defense of noncoverage with respect to that portion of the mold which was not caused by the early 2001 ice dam, but instead was caused by events not covered under the terms of Sykes' policy. While Lumbermen's did admit coverage for mold resulting from the ice dam, this is entirely consistent with its denial of coverage for mold resulting from other causes. In that regard, this case is analogous to *Chatham*, 351 Ill. App. 3d 353, 812 N.E.2d 483. In *Chatham*, there was an explosion on the insured's property. The insurer paid for the facility's reconstruction as well as for certain inbound freight costs; however, it denied coverage for the insured's outbound freight costs. *Chatham*, 351 Ill. App. 3d at 355, 812 N.E.2d at 486-87. The court found that the insurer had not waived its right to deny coverage for those outbound costs, stating that "payment of

covered expenses cannot constitute waiver of payment of noncovered expenses." *Chatham*, 351 Ill. App. 3d at 366, 812 N.E.2d at 494; accord *Western Casualty & Surety Co. v. Walker*, 84 Ill. App. 3d 129, 404 N.E.2d 1119 (1980) (insurer's payments under medical payment coverage were consistent with its denial of coverage under the policy's liability provisions, so they did not operate as waiver with respect to those liability provisions). This lack of waiver was particularly true in light of the reservation of rights letters that the insurer sent to the insured. *Chatham*, 351 Ill. App. 3d at 366, 812 N.E.2d at 494. Similarly, in the case at hand, nothing in Lumbermen's conduct suggests an intent to abandon the defense of noncoverage for mold resulting from causes lying outside the scope of the policy, especially since it reserved its rights in multiple letters to Sykes. Thus, its admittance of coverage for ice dam-related mold does not function as waiver with respect to other mold that grew in Sykes' house.

Lumbermen's second argument is that, at the time it made its statements suggesting that coverage would be afforded to Sykes, its investigation into the cause of the mold was still ongoing, so it did not have the requisite knowledge for its statements to constitute waiver.

The parties disagree on the degree of knowledge that is required on the part of an insurer before waiver can be found. Lumbermen's argues that actual knowledge of all relevant facts is required, citing *American States Insurance Co. v. National Cycle, Inc.*, 260 Ill. App. 3d 299, 307, 631 N.E.2d 1292, 1298 (1994), for the proposition that an insurer may not waive a defense unless it is "aware of the facts giving rise to that defense." However, Lumbermen's misstates the rule of *American States*. It is true that generally, a party will not be found to have waived rights of which it is ignorant. *Kenilworth*, 20 Ill. App. 3d at 620, 313 N.E.2d at 677 (1974). Nevertheless,

No. 1-07-0860

the *American States* court also found that " '[a]n insurer may waive a policy defense by continuing under a policy when it knows, or in the exercise of ordinary diligence, could have known the facts in question giving rise to the defense.' " *American States*, 260 Ill. App. 3d at 306, 631 N.E.2d at 1297, quoting *Kenilworth*, 20 Ill. App. 3d at 620, 313 N.E.2d at 677; *State Farm Mutual Automobile Insurance Co. v. Gray*, 211 Ill. App. 3d 617, 620, 570 N.E.2d 472, 475 (1991); *Vasilakis*, 46 Ill. App. 3d at 374, 361 N.E.2d at 3. In the latter case, it can be said that the insurer has constructive knowledge of the relevant facts, and that constructive knowledge may be sufficient to form the basis of waiver even if actual knowledge is absent. See *Home Insurance*, 213 Ill. 2d at 327, 821 N.E.2d at 282 (plaintiff, an excess insurer, waived its right to seek reimbursement from a primary insurer for amounts that plaintiff paid to a common insured, even though plaintiff claimed it did not know the contents of the primary insurer's policy and therefore did not know it had reimbursement rights to be reserved). Thus, under *Kenilworth*, the correct inquiry is whether, at the time Lumbermen's made its admissions regarding coverage, it could have known the facts later leading it to conclude that the mold damage was not covered, if it had been exercising "ordinary diligence." *Kenilworth*, 20 Ill. App. 3d at 620, 313 N.E.2d at 677.

Sykes contends that Lumbermen's had adequate time to fully investigate the cause of the mold by the time it made its admissions of coverage. However, Sykes presents no evidence for this assertion beyond a recitation of the timeline of events, as well as conclusory assertions that Lumbermen's "certainly" could have discovered the cause of the mold sooner had it been exercising ordinary diligence. Without further information on what constitutes ordinary

-23-

diligence among insurers when researching claims of this nature, as well as the difficulty involved in determining the cause of mold damage, we are unable to say whether Lumbermen's acted properly in its investigation of Sykes' claim. This is particularly true because, on a motion for summary judgment, we are called to view all the evidence in the light most favorable to the nonmoving party (*General Casualty Insurance*, 199 Ill. 2d at 284, 769 N.E.2d at 20) and may not weigh evidence (*Ciesiolkiewicz*, 243 Ill. App. 3d at 510, 611 N.E.2d at 1282). Hence, because there was a genuine issue of material fact regarding Lumbermen's diligence in investigating Sykes' claim, it was improper for the trial court to grant summary judgment to Sykes on the issue of waiver. See *General Casualty Insurance*, 199 Ill. 2d at 284, 769 N.E.2d at 20.

### 2. Estoppel

With respect to estoppel, Sykes contends that she moved out of her home and retained Purofirst to perform remediation on her home in reliance on Lumbermen's assurances that she would be covered, and thus Lumbermen's should be estopped from subsequently denying coverage. On the other hand, Lumbermen's contends that, to the extent that Sykes may have relied on what she believed were admissions of coverage, her reliance was not reasonable. Alternately, it argues that the reasonableness of such reliance is a factual issue that is improper to decide at the summary judgment stage.

Estoppel, in the insurance context, requires the insured to establish the following: " '(1) that he was misled by the acts or statements of the insurer or its agent; (2) reliance by the insured on those representations; (3) that such reliance was reasonable; and (4) detriment or prejudice suffered by the insured based on the reliance.' " *Chatham*, 351 Ill. App. 3d at 367, 812 N.E.2d at

494, quoting *Dumenric v. Union Oil Co. of California*, 238 Ill. App. 3d 208, 213, 606 N.E.2d 230, 233 (1992); see also *Young v. Allstate Insurance Co.*, 351 Ill. App. 3d 151, 163, 812 N.E.2d 741, 753 (2004). Estoppel may exist even where the insurer did not intend to mislead the insured. *Chatham*, 351 Ill. App. 3d at 367, 812 N.E.2d at 494; see *Zak v. Fidelity-Phenix Insurance Co.*, 34 Ill. 2d 438, 216 N.E.2d 113 (1966). As discussed above, summary judgment on the matter of estoppel is appropriate where the undisputed material facts would lead a reasonable mind to only one conclusion. *Home Insurance*, 213 Ill. 2d at 326, 821 N.E.2d at 282; *Aetna Casualty*, 168 Ill. App. 3d at 1004, 523 N.E.2d at 119.

In examining Sykes' claim of estoppel, the scope of evidence we can consider is necessarily reduced: It is not possible to rely on communications that one is not aware of. Therefore, internal communications of Lumbermen's cannot be used in establishing reliance, where Sykes did not know of these communications at the time her acts in reliance allegedly occurred. See *Illinois Wood Energy Partners, L.P. v. County of Cook*, 281 Ill. App. 3d 841, 852, 667 N.E.2d 477, 484 (1995) (rejecting plaintiffs' estoppel claim based on a finding that plaintiffs' purported reliance on a letter which was never sent to them was unreasonable as a matter of law). Hence, we shall confine our analysis to the correspondence between Lumbermen's and Sykes.

In its brief, Lumbermen's focuses exclusively on the third element of estoppel, arguing that Sykes' alleged reliance on assurances of coverage was unreasonable in light of the numerous reservation of rights letters she received, as well as Johansen's explanation in her March 14, 2002, letter to Sykes that mold unrelated to the ice dams would not be covered under her policy.

No. 1-07-0860

Under Illinois law, a plaintiff seeking to establish estoppel "cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others." *Young*, 351 Ill. App. 3d at 164, 812 N.E.2d at 753 (2004) (insureds' estoppel claim failed because a simple reading of the policy at issue would have revealed that coverage was not offered in the form the insureds expected), quoting *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 987, 684 N.E.2d 816, 825-26 (1997). Lumbermen's contends that, according to the rule articulated in *Young*, Sykes cannot recover under an estoppel theory, because of the reservation of rights letters it sent to her as well as Johansen's disclaimers of coverage in her March 14, 2002, letter.

We find that, under the undisputed facts, Lumbermen's is estopped from raising the defense of noncoverage against Sykes with respect to Sykes' actions undertaken between February 19, 2002, and March 14, 2002, because the allegations in Sykes' affidavit regarding the events of February 19, 2002, are sufficient to establish the elements of estoppel as a matter of law and Lumbermen's has not brought forth evidence to challenge those allegations. See *Rotzoll*, 289 Ill. App. 3d at 418, 681 N.E.2d at 161 (once the party moving for summary judgment has presented facts that would entitle it to judgment if uncontradicted, the burden shifts to the nonmovant to present evidence creating a genuine issue of material fact).

In her affidavit, Sykes states that on or around February 19, 2002, Lumbermen's represented to her that she would be covered, and she acted in reliance upon those representations in authorizing Purofirst to begin remediation on her house. Sykes further alleges detriment resulted to her from her reliance, in that Purofirst's remediation activities damaged her

house, and said damage has not yet been repaired, leaving her house unfit for human habitation. Finally, if this affidavit is taken as true, Sykes' reliance may be considered reasonable as a matter of law, as she could reasonably rely upon the authoritative word of Lumbermen's and its agents. This is particularly true where the insurance company had full access to investigate the cause of the mold damage. Thus, contrary to Lumbermen's contentions, Sykes' belief in coverage based upon such admissions was not premised upon an unreasonable neglect of the plain facts, as was the insured's belief in *Young*. In accepting that the damage to her home was covered, Sykes was not ignoring information that was easily accessible. Rather, she was depending upon Lumbermen's representations concerning investigative results that she had no way to access directly. See *Young*, 351 Ill. App. 3d at 164, 812 N.E.2d at 753. Thus, Sykes' affidavit regarding admissions of coverage on February 19, 2002, alleges facts that, if true, satisfy the four elements of estoppel as described above. See *Chatham*, 351 Ill. App. 3d at 366-67, 812 N.E.2d at 494; *Dumenric*, 238 Ill. App. 3d at 213, 606 N.E.2d at 233.

In seeking to defeat Sykes' allegations of estoppel, Lumbermen's cannot rely on the earlier November 8, 2001, reservation of rights letter that it sent to Sykes notifying her that it would not pay for anything that was not covered under the policy; that letter does not diminish the impact of its subsequent admissions of coverage which Sykes alleges occurred on February 19, 2002. "[A]n insurer's letter setting forth its nonwaiver of the issue of coverage is not, under all circumstances and conditions and at all times, a shield against responsibility to an insured." *Gray*, 211 Ill. App. 3d at 622, 570 N.E.2d at 475; see *Vasilakis*, 46 Ill. App. 3d at 375, 361 N.E.2d at 3. For instance, in *Gray*, the insured filed a claim for damages incurred in an

automobile accident, and the insurer sent her a form indicating that it might have no obligation to pay for any damages lying outside the scope of the policy. However, the insurer later sent the insured a letter indicating that coverage would be afforded to her. The court held that, notwithstanding the original reservation of rights, the insurer's later admission of coverage constituted waiver. *Gray*, 211 Ill. App. 3d at 622, 570 N.E.2d at 475; see also *Vasilakis*, 46 Ill. App. 3d at 375, 361 N.E.2d at 3 (notwithstanding reservation of rights letter sent to insured, insurer waived defense of noncoverage where it subsequently undertook a course of conduct inconsistent with denial of coverage). Likewise, Lumbermen's earlier reservation of rights letter will not shield it from the estoppel created by its later admissions of coverage to Sykes as attested to by her in her affidavit.

Moreover, in that respect, the November 8, 2001, letter does not contradict the admissions of coverage that Sykes testified to in her affidavit: it simply states that, to the extent coverage is not afforded under her policy, she will not receive payment. It makes no definitive statement about the extent to which the mold in her house falls within the scope of her policy. By contrast, Lumbermen's February 19, 2002, admissions provide assurance to her that the mold does indeed come within her policy. As there is no contradiction here, the substance of Sykes' affidavit has still not been controverted so as to create a genuine issue of material fact which would defeat summary judgment. See *Pecora*, 323 Ill. App. 3d at 933-34, 752 N.E.2d at 545; *Rotzoll*, 289 Ill. App. 3d at 418, 681 N.E.2d at 161.

Lumbermen's, however, contends that it has contradicted the substance of Sykes' affidavit in two ways. First, it points to the Purofirst authorization letter that Sykes signed on the

-28-

following day, February 20, 2002. In this letter, Sykes states that she agrees to pay "for any amount not covered by insurance"; moreover, she writes next to this statement that it was a "WRITTEN PROPOSAL FOR ANYTHING INSURANCE WON'T COVER." Lumbermen's contends that both the text of the authorization form and Sykes' handwritten note imply that Sykes may not have believed that she was necessarily covered in full for the mold damage to her house. Therefore, Lumbermen's argues, the letter raises a material issue of fact as to the extent of Sykes' reliance on Lumbermen's purported admissions of coverage. However, this is not a persuasive argument in light of the relationship between Purofirst, Lumbermen's, and Sykes. Sykes' assurances in her contract with Purofirst that she would accept ultimate responsibility for payment do not reflect any doubts on her part about the scope of her coverage; they simply avert any qualms that Purofirst, which is not similarly assured, might have as to the source of its reimbursement. In point of fact, such reassurance on Sykes' part, if anything, may well reflect greater confidence on her part in the assurances of Lumbermen's, so as to provide Purofirst with the assurance that she would be responsible for their ultimate payment. Therefore, it does not contradict the substance of her affidavit, and it is thus insufficient to create an issue of material fact that would defeat summary judgment on the matter of estoppel.

Lumbermen's, however, contends that Johansen's March 14, 2002, letter to Sykes provides evidence that Lumbermen's did not admit full coverage and therefore serves to contradict Sykes' affidavit. It points to the language of Johansen's letter stating that, while damage related to the ice dams will be covered, mold damage in other areas of the house does not fall with the scope of Sykes' policy. This argument, even if correct, would be insufficient to

defeat Sykes' claims of estoppel for detrimental actions which she had already taken in reliance on the February 19 assurances prior to her receipt of the March 14 letter. In fact, the record reflects the fact that by the time Sykes received this letter, she had already relied to her detriment upon Lumbermen's assurances by retaining Purofirst the very next day.

Nevertheless, Johansen's March 14, 2002, letter is relevant here, because to the extent that it purports to retract coverage, it would render Sykes' continued reliance on Lumbermen's February 19 assurances no longer reasonable. In order to analyze the legal impact of Johansen's letter, it is first necessary to clarify what the letter says about coverage, because the parties disagree on this issue: Sykes argues that the letter operates as a full admission of coverage, while Lumbermen's argues that the letter shows an intent to pursue its rights under the policy to their fullest. Both sides are partially correct. We find that any reasonable insured reading the March 14, 2002, letter would conclude that a significant portion of the mold was related to the early 2001 ice dam event, and all such mold would be covered under the policy. This is apparent from Johansen's statement that "[i]n this claim, the mold was a result of a covered loss (the ice dams) and therefore it was covered." Johansen went on to assure Sykes that mold damage in areas related to the ice dams was covered. A reasonable insured would take this to mean that Lumbermen's had undertaken sufficient investigation to fairly reach such conclusions. Lumbermen's argues that, at the time it sent this letter, it had not yet concluded its investigation and was not fully aware of the facts that would later lead it to deny coverage; however, this is immaterial to the issue of estoppel, as Sykes was not privy to Lumbermen's internal deliberations or its investigative results, as discussed above. Thus, Sykes' reliance upon the representations of

coverage in this letter was reasonable and not premised upon neglect of readily apparent facts. See *Young*, 351 Ill. App. 3d at 164, 812 N.E.2d at 753.

However, it would be unreasonable for Sykes to conclude from Johansen's letter that all the mold in her house would be covered, since Johansen makes it clear in that same letter that mold resulting from excluded causes instead of the ice dam would not fall within the scope of her policy. Furthermore, these statements from Johansen echoed the prior reservation of rights letters that Sykes received, which informed her that the investigation was still ongoing and that the extent of coverage was uncertain, as well as pointing out some of the relevant limitations in her policy. To the extent that Sykes chose to ignore these letters and the language of her policy to believe that full coverage would necessarily be provided to her for all mold damage, she would be like the insured in *Young*, ignoring information made readily available to her – and such unreasonable belief cannot form the basis of estoppel. *Young*, 351 Ill. App. 3d at 164, 812 N.E.2d at 753.

This is significant because "the doctrine of equitable estoppel will not apply to a case if the defendant's conduct terminated within ample time to allow the plaintiff to still avail himself of any legal rights he may have had." *Smith v. Cook County Hospital*, 164 Ill. App. 3d 857, 866, 518 N.E.2d 336, 342 (1987). The facts of *Smith* are instructive. In *Smith*, plaintiff filed a medical malpractice suit against his former doctors. Though the time allotted by the statute of limitations had passed, plaintiff argued that the doctors were estopped from asserting the statute as a defense, since their actions lulled him into not filing suit until it was too late. The court rejected this argument, finding that even if it could be said that the doctors' actions lulled

-31-

plaintiff into complacency, any such lulling ended when their treatment of him ceased, which was four years before the statute of limitations had run out, plenty of time for him to bring suit. *Smith*, 164 Ill. App. 3d at 866, 518 N.E.2d at 342.

Likewise, although Sykes' uncontradicted affidavit shows that she was lulled into believing she was fully covered by Lumbermen's admissions on February 19, she could no longer claim a reasonable belief in full coverage after having received Johansen's March 14 letter. To the extent that Sykes committed action or inaction after March 14, 2002, that was premised upon faith in full coverage, such reliance may not be reasonable, and thus it may not be a proper basis for a finding of estoppel. For instance, we cannot say as a matter of law that Sykes' continued retention of Purofirst after receiving notification that not all the mold in her house would be covered is necessarily reasonable. Rather, reasonable minds might differ as to whether Sykes acted reasonably in allowing Purofirst to continue its remediation work from that point in time until the point where Lumbermen's finally denied all coverage. See *Ciesiolkiewicz*, 243 Ill. App. 3d at 510, 611 N.E.2d at 1282 (summary judgment inappropriate where reasonable minds could draw different inferences from the undisputed facts).

Hence, although the substance of Sykes' affidavit regarding the events of February 19, 2002, remains uncontradicted, in that Sykes relied reasonably and to her detriment on Lumbermen's assurances of coverage on that date, there is a material issue of fact as to whether such reliance remained reasonable after Sykes received Johansen's March 14, 2002, letter with its disclaimers of coverage for mold appearing in non-ice-dam-related areas. See *Smith*, 164 Ill. App. 3d at 866, 518 N.E.2d at 342. We therefore affirm the trial court's grant of summary

judgment on the issue of estoppel with respect to damages that Sykes incurred based on her reliance between February 19, 2002, and March 14, 2002, on Lumbermen's assertions of coverage. That is, Lumbermen's is estopped from denying coverage for damages resulting to Sykes' home and property from actions that were initiated by Purofirst within this timespan, as well as any other reliance-based damages that Sykes suffered as a result of her actions in this timeframe. However, we reverse the trial court's grant of summary judgment with respect to damages that Sykes incurred based on any post-March 14 reliance on a belief in full coverage. Such damages would include, but are not necessarily limited to, remediation actions initiated by Purofirst after March 14. Estoppel does not exist for post-March 14 damages except to the extent that Sykes' actions are reasonable in reliance upon the admissions Johansen made in her March 14 letter, which cannot be decided as a matter of law at the summary judgment stage. We therefore remand for the trial court to make this determination.

### B. Regarding the Trial Court's Grant of Injunctive Relief

We next consider whether the trial court abused its discretion in issuing an injunction requiring Lumbermen's to pay Sykes' additional living expenses pursuant to her policy. Lumbermen's argues that injunctive relief was improper for two reasons: first, that it was based entirely upon the trial court's finding that Lumbermen's waived its right to assert and was estopped from asserting the defense of non-coverage, which Lumbermen's contends is erroneous; second, that Sykes failed to show that she had no adequate remedy at law.

Lumbermen's first contention must fail, as the trial court was correct insofar as it found that Lumbermen's was estopped as a matter of law from asserting the defense of non-coverage

for the mold damage to Sykes' home, insofar as Sykes relied reasonably on Lumbermen's assertions in initially authorizing Purofirst to remediate her home and continuing to retain Purofirst through March 14, 2002.

Lumbermen's second contention is that Sykes has not met the requirements for injunctive relief, as monetary damages will adequately compensate her for her claimed losses. A preliminary injunction is an extraordinary remedy (*Board of Education of Dolton School District 149 v. Miller*, 349 Ill. App. 3d 806, 814, 812 N.E.2d 688, 695 (2004)), and mandatory preliminary injunctions are disfavored by the courts. *Shodeen v. Chicago Title & Trust Co.*, 162 Ill. App. 3d 667, 673, 515 N.E.2d 1339, 1344 (1987). It is available only in those cases where an emergency exists and serious harm would result if an injunction were not issued to preserve the status quo. *Miller*, 349 Ill. App. 3d at 814, 812 N.E.2d at 695. Therefore, for a party to obtain injunctive relief, it must demonstrate the following: "(1) it has a certain and clearly ascertainable right which must be protected; (2) it will be irreparably injured in the absence of that protection; (3) it has no adequate remedy at law for its injury; and (4) it is likely to be successful on the merits." *Best Coin-Op, Inc. v. Old Willow Falls Condominium Ass'n*, 120 Ill. App. 3d 830, 834, 458 N.E.2d 998, 1001 (1983). It is the third element of this test that Lumbermen's challenges. We shall therefore confine our analysis to this element.

It is a well-established rule that, if a party's injury can be adequately compensated through money damages, then it has an adequate remedy at law and does not need the extraordinary remedy of injunctive relief. *Miller*, 349 Ill. App. 3d at 814, 812 N.E.2d at 695; *Best Coin-Op*, 120 Ill. App. 3d at 834, 458 N.E.2d at 1001. It is only when money is insufficient

to compensate the injury, or when the injury cannot be properly quantified in terms of money, that injunctive relief is necessary. *Miller*, 349 Ill. App. 3d at 814, 812 N.E.2d at 695 (finding that the trial court abused its discretion in granting injunctive relief, in part because the harm could be measured by monetary standards), citing *Franz v. Calaco Development Corp.*, 322 Ill. App. 3d 941, 947, 751 N.E.2d 1250, 1257 (2001). Under *Miller*, *Best Coin-Op*, and *Franz*, we find that since the trial court was able to calculate with precision the amount of additional living expenses incurred by Sykes on a monthly basis, monetary damages are a perfectly adequate remedy for her loss, and so the trial court abused its discretion in granting her a preliminary injunction.

Sykes, however, contends that courts possess the power to grant injunctive relief even where an alleged harm can be compensated with monetary damages, citing *Jones v. Department of Public Aid*, 373 Ill. App. 3d 184, 867 N.E.2d 563 (2007). However, *Jones* is inapposite: in *Jones*, the nonmoving party did not dispute that the movant had no adequate remedy at law. Instead, it argued solely that the movant had no clearly ascertainable right which had to be protected. The court, accordingly, confined its analysis exclusively to that part of the test. *Jones*, 373 Ill. App. 3d at 193, 867 N.E.2d at 572. Hence, *Jones* cannot be used for the proposition that injunctive relief may be proper even where the movant has an adequate remedy of law, since that element was not even under consideration by the court.

Sykes also argues that in her particular case, after-the-fact monetary damages granted at the conclusion of the lawsuit will not adequately compensate the wrong that has been done to her, because she is "financially destitute" at present and lacks sufficient funds to obtain housing

in the absence of immediate injunctive relief.[5]  However, she presents no case law in support of the proposition that financial hardship of a party seeking a preliminary injunction may transform a request for pure monetary damages into a situation in which the granting of injunctive relief is appropriate.  As discussed above, when a wrong is calculable in terms of money damages which are readily and precisely calculable, then the wronged party has an adequate remedy at law and is not in need of the extraordinary remedy of injunctive relief.  *Miller*, 349 Ill. App. 3d at 814, 812 N.E.2d at 695; *Best Coin-Op*, 120 Ill. App. 3d at 834, 458 N.E.2d at 1001.  While the court may choose to enter a judgment for monetary damages or expenditures incurred by Sykes, it cannot grant an *in personam* mandatory injunction to achieve that purpose.  See *First Baptist Church of Lombard v. Toll Highway Authority*, 301 Ill. App. 3d 533, 543, 703 N.E.2d 978, 985 (1998) (stating that "[i]n an action for an injunction, the court may, in lieu of an injunction, give a judgment for damages" and upholding the trial court's decision to take such action), citing Restatement (Second) of Torts, §951 (1979).

Sykes additionally argues that the purpose of injunctive relief is to preserve the status quo (*Shodeen*, 162 Ill. App. 3d at 673, 515 N.E.2d at 1344), and that in this case, the relevant status quo that must be protected is the situation before July 31, 2002, in which Lumbermen's was paying for her additional living expenses under the policy.  However, Sykes cites no authority to show that courts may issue injunctive relief to preserve the status quo even where, as here, the

---

[5] We note that the record indicates that Sykes is not without housing, though it may not be housing of her preference, since at the evidentiary hearing on her motion for a preliminary injunction she testified that she was living at her mother's house.

movant has failed to make a *prima facie* case that injunctive relief is necessary and appropriate. Indeed, the *Shodeen* court goes on to state that mandatory injunctive relief may only be granted when the need for such relief is "clearly established and free from doubt." *Shodeen*, 162 Ill. App. 3d at 673, 515 N.E.2d at 1344. Given that Sykes has failed to demonstrate one of the elements necessary for injunctive relief, her need for it is not clearly established under the law, and issuance of an injunction is therefore improper.

Finally, Sykes argues that the balance of equities is on her side, considering the severe impact that lack of money for housing will have on her, when compared with the relatively slight impact on Lumbermen's from having to pay her living costs. She cites *Shodeen*, 162 Ill. App. 3d at 673, 515 N.E.2d at 1344, for the proposition that equity is an important factor in determining whether a preliminary injunction should issue. However, *Shodeen* only calls for balancing of the equities once the party seeking injunctive relief has established its prima facie case, i.e., showed that all four of the required elements necessary for injunctive relief are present in its case. *Shodeen*, 162 Ill. App. 3d at 673, 515 N.E.2d at 1344.

Thus, we affirm the trial court's summary judgment for Sykes on her breach of contract and estoppel claim with regard to damages that Sykes incurred based upon actions initiated in the period between February 19, 2002, and March 14, 2002, but we reverse the remaining portion of the summary judgment. We also reverse the trial court's grant of injunctive relief to Sykes for additional living expenses.

Affirmed in part, reversed in part, and remanded for proceedings not inconsistent with this opinion.

McBRIDE, P.J., and O'MALLEY, J., concur.

No. 1-07-0860

| | REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT<br>(Front Sheet to be Attached to Each Case) |
|---|---|
| Please use the following form | Lumbermen's Mutual Casualty Company,<br><br>      Plaintiff and Counterdefendant-Appellant,<br><br>v.<br><br>Gloria Sykes,<br><br>      Defendant and Counterplaintiff-Appellee. |
| Docket No.<br><br>COURT<br><br><br>Opinion Filed | No. <u>1-07-0860</u><br><br>Appellate Court of Illinois<br>First District, <u>SIXTH</u> Division<br><br><u>June 20, 2008</u><br>(Give month, day and year) |
| <br><br>JUSTICES | JUSTICE JOSEPH GORDON DELIVERED THE OPINION OF THE COURT:<br><br>  <u>McBride, P.J., and O'Malley, J.</u>  , concur. |
| APPEAL from the Circuit Court of Cook County; the Hon___ Judge Presiding. | Lower Court and Trial Judge(s) in form indicated in margin:<br><br>Appeal from the Circuit Court of Cook County.<br><br>The Hon. <u>Mary A. Mulhern</u> Judge Presiding. |
| <br><br><br><br>APPELLANTS:<br>John Doe, of Chicago | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.<br><br><u>APPELLANT: Thomas J. Finn, Leahy, Eisenberg & Fraenkel, Ltd., 161 N. Clark Street, Suite 1325, Chicago, Illinois 60601-3288</u> |
| For APPELLEES, Smith and Smith of Chicago | <u>APPELLEES: Gene Moskowitz, Gene Moskowitz and Associates, Ltd., 205 W. Wacker Drive, Suite 1600, Chicago, Illinois 60606; Kevin B. Salam, P.C., 1 N. LaSalle Street, Suite 3900, Chicago, Illinois 60602</u> |
| Add attorneys for 3rd party appellants and/or appellees. | |